UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
COLUMBUS McKINNON CORPORATION,       :
                                     :
                    Plaintiff,       :     15 Civ. 5088 (VM)
                                     :
        - against -                  :     **DECISION AND ORDER**
                                     :
THE TRAVELERS INDEMNITY COMPANY,     :
et al.,                              :
                                     :
                    Defendants.      :
----------------------------------X
THE TRAVELERS INDEMNITY COMPANY,     :
                                     :
        Third-Party Plaintiff,       :
                                     :
        - against -                  :
                                     :
SENTRY INSURANCE A MUTUAL COMPANY,   :
et al.,                              :
                                     :
        Third-Party Defendants.      :
----------------------------------X
VICTOR MARRERO, United States District Judge.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/28/15

## I.    BACKGROUND

Plaintiff Columbus McKinnon Corporation ("Columbus McKinnon" or "Plaintiff") brought this action against defendants The Travelers Indemnity Company ("Travelers") and Liberty Mutual Insurance Company ("Liberty Mutual," and together with Travelers, "Defendants"), alleging that insurance policies issued to Columbus McKinnon by Travelers and Liberty Mutual obligate them to defend and indemnify Columbus McKinnon regarding thousands of personal injury lawsuits filed against Columbus McKinnon. (See Dkt. No. 1.)

By Order dated December 7, 2017 (Dkt. No. 159), the Court referred several dispositive motions to Magistrate Judge Debra Freeman. Specifically, the Court referred Plaintiff's motion for partial summary judgment regarding Defendants' duty to defend ("Plaintiff's Motion," Dkt. No. 114) and Defendants' five cross-motions for partial summary judgment regarding the duty to defend (Dkt. No. 132), allocation of defense costs (Dkt. No. 136), Plaintiff's breach of the cooperation and voluntary payments provisions (Dkt. No. 128), defense rates (Dkt. No. 135), and the duty to indemnify (Dkt. No. 130) (collectively, "Defendants' Cross-Motions").

On August 10, 2018, Magistrate Judge Debra Freeman issued a Report and Recommendation, a copy of which is attached and incorporated herein, recommending that Plaintiff's Motion be granted in part and denied in part. (See "Report," Dkt. No. 168 at 57.) The Report further recommended that Defendants' Cross-Motions be resolved as follows: the motion regarding the duty to defend be granted in part and denied in part; the motion regarding allocation of defense costs be granted in part and denied in part; the motion regarding Plaintiff's breach of the cooperation and voluntary payments provisions be denied; the motion regarding defense rates be denied; and the motion regarding the duty to indemnify be granted in part and denied in part. (See id. at

2

57-58.)

On September 7, 2018, Columbus McKinnon, Travelers, and Liberty Mutual filed timely objections to the Report and Recommendation, and challenged its findings and conclusions on various grounds. (See "September 7 Objections," Dkt. Nos. 178, 179, 180.) On September 21, 2018, Columbus McKinnon, Travelers, and Liberty Mutual filed timely responses to the September 7 Objections. (See Dkt. Nos. 185, 186, 189.)

For the reasons stated below, the Court adopts the recommendations of the Report in their entirety.

## II. **STANDARD OF REVIEW**

A district court evaluating a magistrate judge's report may adopt those portions of the report to which no "specific written objection" is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law. Fed. R. Civ. P. 72(b); see also Thomas v. Arn, 474 U.S. 140, 149 (1985). However, "[w]hen a timely and specific objection has been made, the court is obligated to review the contested issues de novo." Fischer v. Forrest, 286 F. Supp. 3d 590, 600-01 (S.D.N.Y. 2018) (citing Fed. R. Civ. P. 72(b) and Hynes v. Squillace, 143 F.3d 653, 656 (2d Cir. 1998)). A district court is not required to review any portion of a magistrate judge's report that is not the subject of an objection. See

3

Thomas, 474 U.S. at 149. Because motions for summary judgment require a final determination of the parties' claims, a district court's review of a magistrate judge's determination of such a motion should be evaluated under the de novo standard applicable to dispositive matters under Federal Rule of Civil Procedure 72(b), as opposed to the clearly erroneous or contrary to law standard applicable to a magistrate judge's ruling as to non-dispositive matters under Federal Rule of Civil Procedure Rule 72(a). A district judge may accept, set aside, or modify, in whole or in part, the findings and recommendations of the magistrate judge. See Fed. R. Civ. P. 72(b).

## III. DISCUSSION

Upon a de novo review of the full factual record in this litigation, including the pleadings and the parties' respective papers submitted in connection with the underlying motions and in this proceeding, as well as the Report and applicable legal authorities, the Court reaches the same conclusions as Magistrate Judge Freeman. The Court further concludes that the findings, reasoning, and legal support for the recommendations made in the Report are consistent with applicable law as set forth in the cases and statutes relied upon therein, and are thus warranted. Accordingly, for substantially the reasons set forth in Magistrate Judge

Freeman's thorough and detailed Report, the Court adopts in their entirety the Report's factual and legal analyses and determinations, as well as its substantive recommendations, as the Court's ruling on Plaintiff's Motion (Dkt. No. 114) and Defendants' Cross-Motions (Dkt. Nos. 128, 130, 132, 135, 136).

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge Debra Freeman dated August 10, 2018 (Dkt. No. 168) is adopted in its entirety, and the objections of Plaintiff Columbus McKinnon Corporation, Defendant/Third-Party Plaintiff The Travelers Indemnity Company, and Defendant Liberty Mutual Insurance Company (Dkt. Nos. 178, 179, 180) are **DENIED**. It is further

**ORDERED** that Plaintiff's motion for partial summary judgment (Dkt. No. 114) is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that Defendants' cross-motion for partial summary judgment regarding the duty to defend (Dkt. No. 132) is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that Defendants' cross-motion for partial summary judgment regarding allocation of defense costs (Dkt. No. 136) is **GRANTED IN PART AND DENIED IN PART**; and it is

further

**ORDERED** that Defendants' cross-motion for partial summary judgment regarding Plaintiff's breach of the cooperation and voluntary payments provisions (Dkt. No. 128) is **DENIED**; and it is further

**ORDERED** that Liberty Mutual's cross-motion for partial summary judgment regarding defense rates (Dkt. No. 135) is **DENIED**; and it is finally

**ORDERED** that Defendants' cross-motion for partial summary judgment regarding the duty to indemnify (Dkt. No. 130) is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

Dated:     New York, New York
           28 September 2018

Victor Marrero
U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COLUMBUS McKINNON CORPORATION,

Plaintiff,

-against-

THE TRAVELERS INDEMNITY COMPANY,
*et al.*,

Defendants.

15cv5088 (VM) (DF)

**REPORT AND
RECOMMENDATION**

---

THE TRAVELERS INDEMNITY COMPANY,

Third-Party Plaintiff,

-against-

SENTRY INSURANCE A MUTUAL COMPANY
and CM INSURANCE COMPANY, INC.,

Third-Party Defendants.

---

**TO THE HONORABLE VICTOR MARRERO, U.S.D.J.:**

In this insurance coverage action, plaintiff Columbus McKinnon Corporation ("Plaintiff")
is seeking a declaration that its insurers, defendants Travelers Indemnity Company ("Travelers")
and Liberty Mutual Insurance Company ("Liberty Mutual") (together, the "Insurers" or
"Defendants") breached their duties to defend and indemnify Plaintiff in connection with
numerous product liability claims (specifically, bodily injury claims resulting from asbestos
exposure) that have been asserted against Plaintiff in several jurisdictions across the United
States (the "Underlying Asbestos Claims" or the "Claims"). On the claims raised in its
Complaint, Plaintiff is also seeking reimbursement for the costs it incurred, both to defend

against the Underlying Asbestos Claims and to settle certain of them, after Defendants allegedly breached their obligations.

Currently before this Court, pursuant to a reference to report and recommend on dispositive motions, are (1) a motion by Plaintiff seeking partial summary judgment in its favor on the issue of whether Defendants have a duty to provide Plaintiff with a complete defense on any pending Underlying Asbestos Claims and any similar claims that may be asserted in the future (Dkt. 114), and (2) five separate cross-motions by Defendants, seeking partial summary judgment in their favor on the issues of (a) whether the Claims give rise to a duty to defend at all (Dkt. 132); (b) whether, assuming a defense obligation, any defense costs should be allocated *pro rata* with Plaintiff, based on the fact that Plaintiff was self-insured for a period of time relevant to the Claims (Dkt. 136); (b) whether any duty to defend and/or indemnify has been vitiated by Plaintiff's purported lack of cooperation in its defense by the Insurers, and/or by Plaintiff's voluntary payments to resolve some of the Claims (Dkt. 128); (d) whether the attorneys' fees charged to Plaintiff by the law firm that it retained to defend against the Claims (after Defendants' allegedly breached their duty to defend) are based on billing rates that are unreasonably high as a matter of law, such that, if Defendants are required to pay any past-incurred defense costs, Defendants should not have to reimburse Plaintiff at those rates (Dkt. 135); and (e) whether Defendants have any obligation to indemnify Plaintiff on the Underlying Asbestos Claims (Dkt. 130).

In this Report and Recommendation, this Court will address: first, Plaintiff's motion on the duty to defend, together with Defendants' cross-motions on the duty to defend and the allocation of defense costs; second, Defendants' cross-motions on Plaintiff's alleged failure to abide by the cooperation and voluntary payment provisions of the relevant insurance policies,

2

and on the reasonableness of defense costs; and, finally, Defendants' cross-motion on the duty to indemnify. For the reasons discussed below, I recommend that Plaintiff's motion, as well as Defendants' cross-motions on the duty to defend, the allocation of defenses costs, and the duty to indemnify, be granted in part and denied in part, and that Defendants' cross-motions regarding Plaintiff's duty of cooperation, voluntary payments, and the reasonableness of defense costs be denied.

## BACKGROUND

### A.    Factual Background

The relevant evidentiary record in this case has been presented by the parties through nine Declarations or Affidavits and exhibits thereto.[1] In addition, pursuant to Local Civil Rule 56.1, the parties have filed no fewer than 17 dueling statements of facts that are supposedly undisputed, or that the parties claim are contested.[2] This Court has reviewed the submitted

---

[1] *See* (1) Declaration of Nicholas Schretzman, dated Aug. 18, 2017 ("Schretzman Decl.") (Dkt. 116), submitted in support of Plaintiff's motion; (2) Declaration of John Maloney, dated Sept. 22, 2017 ("Maloney Decl.") (Dkt. 143), submitted in support of Defendants' cross-motions on the duty to defend, and on the issue of cooperation and voluntary payment; (3) Affidavit of John Robert Burkey, sworn to Sept. 16, 2013 (Dkt. 143), attached as Exhibit 57 to the Maloney Decl.; (4) Declaration of Pamela J. Minetto, dated Sept. 22, 2017 ("Minetto Decl.") (Dkt. 144), submitted in support of Defendants' cross-motions on the issues of allocation of defense costs and the reasonableness of defense rates; (5) Declaration of John S. Pierce Regarding the Reasonableness of Hourly Billing Rates, dated Apr. 7, 2017 ("Pierce Decl.") (Dkt. 144), attached as Exhibit 20 to the Minetto Decl.; (6) Affidavit of David E. Woodworth, sworn to Sept. 19, 2017 (Dkt. 145), submitted in support of Defendants' cross-motion on the issue of allocation of defense costs; (7) Declaration of David A. Luttinger, Jr., dated Oct. 20, 2017 ("Luttinger Decl.") (Dkt. 148), submitted by Plaintiff in opposition to the cross-motions; (8) Affidavit of John D. Crowell, sworn to Jul. 5, 2017 (Dkt. 148), attached as Exhibit 41 to the Luttinger Decl.; and (9) Supplemental Declaration of John Maloney, dated Dec. 1, 2017 (Dkt. 158), submitted in further support of Defendants' cross-motion on the duty to defend.

[2] *See* Local Civil Rule 56.1 Statements:

(1) filed by Plaintiff on Aug. 23, 2017, in support of its motion ("Pl. 56.1 Stmt.") (Dkt. 118);

evidence and the parties' several Rule 56.1 Statements, and, in the following summary, has attempted to highlight those undisputed and disputed facts that are most pertinent to this Court's recommendation as to how the motion and cross-motions should be resolved.

## 1. The Insurance Policies Issued by Defendants

This litigation involves insurance policies issued by both Travelers (the "Travelers Policies") and Liberty Mutual (the "Liberty Mutual Policies") (collectively, the "Policies"), as described below.

### a. The Travelers Policies

The Travelers Policies consist of various primary general liability, umbrella and/or catastrophe, and excess insurance policies issued by Travelers to Plaintiff, as the named insured, over a 27-year period, from April 1, 1958 to April 1, 1985 (the "Travelers Policy Period"). (Pl. 56.1 Stmt. ¶¶ 38, 40, 44, 48, 52, 56, 60, 63, 66, 69, 72, 75, 78, 81, 84; Def. Duty To Defend 56.1 Stmt. ¶¶ 1-3, 8.) The general liability policies were in effect for the entire Travelers Policy Period. (Pl. 56.1 Stmt. ¶ 38; Def. Duty To Defend 56.1 Stmt. ¶ 1.) The umbrella/catastrophe

(2-3) filed separately by Travelers and Liberty Mutual on Sept. 22, 2017, in opposition to Plaintiff's motion ("Travelers 56.1 Response" (Dkt. 127); "Liberty Mutual 56.1 Response" (Dkt. 134));

(4-10) filed jointly or separately by Defendants on Sept. 22, 2017, in support of Defendants' various cross-motions ("Def. Duty To Defend 56.1 Stmt." (Dkt. 143); "Def. Allocation 56.1 Stmt." (Dkt. 145); "Travelers Supp. Allocation 56.1 Stmt." (Dkt. 145); "Def. Coop./Vol. Paymt. 56.1 Stmt." (Dkt. 141); "Liberty Mutual Rates 56.1 Stmt." (Dkt. 144); "Travelers Supp. Rates 56.1 Stmt." (Dkt. 144); and "Def. Duty To Indemnify 56.1 Stmt." (Dkt. 142)); and

(11-17) filed by Plaintiff on Oct. 20, 2017, in opposition to Defendants' cross-motions ("Pl. Duty To Defend 56.1 Response" (Dkt. 148); "Pl. Allocation 56.1 Response" (Dkt. 148); "Pl. Coop./Vol. Paymt. 56.1 Response" (Dkt. 148); "Pl. Rates 56.1 Response" (Dkt. 148); "Pl. Duty To Indemnify 56.1 Response" (Dkt. 148)).

4

policies were in effect only from sometime in June 1970[3] to January 1, 1973, and again from January 1, 1974 to January 1, 1977. (Pl. 56.1 Stmt. ¶¶ 40, 44, 48, 52, 56; Def. Duty To Defend 56.1 Stmt. ¶ 2.) The excess policies were in effect only from January 1, 1968 to January 1, 1974, and again from January 1, 1977 to April 1, 1984. (Pl. 56.1 Stmt. ¶¶ 60, 63, 66, 69, 72, 75, 78, 81, 84; Def. Duty To Defend 56.1 Stmt. ¶ 3).

The general liability policies contain the same, or very similar, coverage provisions, and state, in relevant part:

> The company [Travelers] will pay on behalf of the insured [Plaintiff] all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury . . . to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury . . . even if any of the allegations of the suit are groundless, false, or fraudulent . . .

(Pl. 56.1 Stmt. ¶¶ 5, 8, 11, 15, 19, 23, 27, 31, 35; Def. Duty To Defend 56.1 Stmt. ¶¶ 4, 5 (emphasis omitted).)

Travelers also issued umbrella/catastrophe policies to Plaintiff, which generally provide coverage "for damages in excess of the retained limit [of the general liability policies] because of bodily injury . . . to which [the] policy applies" (Pl. 56.1 Stmt. ¶¶ 41, 45, 49, 53, 57; Def. Duty To Defend 56.1 Stmt. ¶ 6), and excess policies that provide additional coverage, "subject to all of the conditions, agreements, exclusions and limitations of . . . the underlying insurance in all respects." (Pl. 56.1 Stmt. ¶¶ 67, 70, 73, 76, 79; Def. Duty To Defend 56.1 Stmt. ¶ 7).

---

[3] Plaintiff states that the effective date of the umbrella/catastrophe policies was June 3, 1970 (Pl. 56.1 Stmt. ¶ 40), while Defendants state that the effective date was June 30, 1970 (Def. Duty To Defend 56.1 Stmt. ¶ 2).

The Travelers Policies also contain cooperation and voluntary payment provisions, which generally provide:

> The insured shall cooperate with the company ... and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.

*(See, e.g.*, Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 4 (quoting Schretzman Decl., Ex. 1 (Dkt. 116-1), at TRAV000658).)

### b.    The Liberty Mutual Policies

The Liberty Mutual Policies consist of general primary liability policies issued by Liberty Mutual to Plaintiff for the period from April 1, 1985 to April 1, 1989 (the "Liberty Mutual Policy Period") (together with the Travelers Policy Period, the "Policy Periods"). (Pl. 56.1 Stmt. ¶¶ 88, 90, 92, 94, 96; Def. Duty To Defend 56.1 Stmt. ¶ 9.) Plaintiff is the named insured under these Liberty Mutual policies. *(See generally* Pl. 56.1 Stmt.; Def. Duty To Defend 56.1 Stmt. ¶ 13.) The policies in effect from April 1985 through March 1988 generally provide:

> The company [Liberty Mutual] will pay on behalf of the insured [Plaintiff] all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury ... to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury ... even if any of the allegations of the suit are groundless, false, or fraudulent ...

(Pl. 56.1 Stmt. ¶¶ 89, 91, 93, 95; Def. Duty To Defend 56.1 Stmt. ¶¶ 10-12.)

The policy in effect from April 1, 1988 through April 1, 1989 differs somewhat from the other Liberty Mutual Policies. That policy provides that Liberty Mutual "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or

6

'property damage' to which this insurance applies." (Pl. 56.1 Stmt. ¶ 97; Def. Allocation 56.1

Stmt. ¶ 9.) It also contains the following non-cumulation provision:

> If the same "occurrence" gives rise to "bodily injury" or "property
> damage" which occurs partly before and partly within the policy
> period, our each occurrence limit under this policy will be reduced
> by the amount of each payment made by us with respect to such
> "occurrence" under a previous policy or policies of which this
> policy is a replacement.

(Pl. 56.1 Stmt. ¶ 98; Def. Allocation 56.1 Stmt. ¶ 12.)

All of the Liberty Mutual Policies contain similar cooperation and voluntary payment

provisions, which generally provide:

> The insured shall cooperate with the company and, upon the
> company's request, assist in making settlements in the conduct of
> suits and in enforcing any right of contribution or indemnity
> against any person or organization who may be liable to the
> insured because of injury or damage with respect to which
> insurance is afforded under this policy, and the insured shall attend
> hearings and trials and assist in securing and giving evidence and
> obtaining the attendance of witnesses. The insured shall not,
> except at his own cost, voluntarily make any payment, assume any
> obligation or incur any expense other than for first aid to others at
> the time of the accident.

(*See, e.g.*, Schretzman Decl., Ex. 25 (Dkt. 116-35), at LMIC000059; Def. Coop./Vol. Paymt.

56.1 Stmt. ¶ 7.)

### 2. **Plaintiff's Captive Insurer**

In 1990, after the last of the Policies had expired, Plaintiff incorporated a wholly-owned

subsidiary, CM Insurance Company, Inc. ("CMIC"), to act as Plaintiff's captive insurance

company. (Def. Allocation 56.1 Stmt. ¶ 13; Pl. Allocation 56.1 Response ¶ 13.) According to

Plaintiff, "captive insurance is a form of self-insurance," and CMIC "was set up so [Plaintiff]

could self-insure its product liability claims." (Pl. Allocation 56.1 Response ¶ 15.) During the

time that CMIC has acted as its captive insurer, Plaintiff asserts that it has remained "financially

7

responsible for all defense and indemnity costs associated with any [a]sbestos [s]uits because [Plaintiff] and CMIC [have] effectively operate[d] as one company." (*Id.* ¶ 16.)

### 3.   The Underlying Asbestos Claims Against Plaintiff and Its After-Acquired Entities

Plaintiff has manufactured hoists since approximately 1935. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 10; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 10.) The last of the Travelers and Liberty Mutual Policies, which provided coverage for bodily injury claims arising out of claimants' use of Plaintiff's hoists, lapsed in 1985 and 1989, respectively. (*See* Background, *supra*, at Section (A)(1).) In 1995, several years after the expiration of the Policies, Plaintiff acquired LTI Holdings, Inc. ("LTI"), a manufacturer and distributer of cranes, as well as hoists. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 11-12; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 11-12.) Then, in 1997, Plaintiff acquired Spreckels Industries Inc., now known as Yale International, Inc. ("Yale"), which also manufactured both cranes and hoists. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 13-14; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 13-14.) As both LTI and Yale were acquired by Plaintiff after the Policies had lapsed, they will both be referred to herein as the "After-Acquired Entities."[4] Plaintiff had not manufactured cranes prior to its acquisition of the After-Acquired Entities, nor had a corporate relationship between Plaintiff and those entities existed prior to the dates of their acquisition. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 15-16; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 15-16.)

---

[4] At points in their submissions, the parties also refer to Lift-Tech International, Inc. ("Lift-Tech") and an entity called "Shaw-Box" as After-Acquired Entities. (*See, e.g.*, Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 16; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 16.) As LTI owned both the Lift-Tech and Shaw-Box brand names (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 11; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 11), this Court will refer herein to LTI, rather than Lift-Tech or Shaw-Box, when discussing the After-Acquired Entities.

8

Since the early 1990s, Plaintiff has been named as a defendant on bodily injury claims resulting from exposure to asbestos-containing products manufactured by Plaintiff and/or the After-Acquired Entities. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 18; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 18.) The asbestos litigation commenced in Maryland, but, over time, emerged in other jurisdictions, as well, including Michigan, California, Illinois, West Virginia, and Pennsylvania. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 18-20; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 18-20.) With the exception of the Maryland litigation and "a single case venued in New York," Defendants assert that the Underlying Asbestos Claims have "universally" involved cranes (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 21), which Plaintiff did not manufacture prior to its acquisition of LIT and Yale. Thus, with few exceptions, Defendants assert that any liability that Plaintiff could face on the Claims, based on the claimants' exposure to asbestos during the coverage periods of the Policies, could only arise from the claimants' exposure to products manufactured by LTI and Yale, which were not acquired by Plaintiff until after the Policies lapsed, and were not themselves insured under the Policies. (*See generally id.*)

Plaintiff disputes this version of the facts, and contends that the asbestos litigation concerns Plaintiff's products generally and, as such, could involve products within the scope of the Policies. Specifically, Plaintiff claims that, although LTI and Yale also made hoists, Plaintiff itself had a "huge market share in hoists" during the Policy Periods, and that the hoists it manufactured were almost always attached to cranes manufactured by others. (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 21 (quoting Maloney Decl., Ex. 11 (Deposition of William Kiniry, Jr. ("Kiniry Dep.")), at 65:15-17, 59:17-20).) Further, Plaintiff explains that hoists themselves were once manufactured with asbestos in their braking mechanisms. (*Id.*) Accordingly, Plaintiff contends that – whether the allegations of the Underlying Asbestos Claims state this explicitly or

9

not – there is a high likelihood that, during the Policy Periods, any given claimant's exposure to asbestos in a crane could have been the result of exposure to asbestos in a hoist (manufactured by Plaintiff) that was itself *attached* to the crane (manufactured by an After-Acquired Entity). (*See* Pl. Duty To Defend 56.1 Response ¶ 35.)

### 4.   The Parties' Defense of Underlying Asbestos Claims Prior to 2011

At some point – the exact timing is disputed – the parties began discussing a cost-sharing agreement to deal with the defense of the Maryland asbestos claims which, by and large, arose from the claimants' alleged exposure to asbestos at a Mack Truck plant in the state (the "Mack Truck Claims"). (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 27-28; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 27-28.) On March 31, 1997, the parties entered into a written cost-sharing agreement regarding defense of the Mack Truck Claims (the "Mack Truck Agreement"). (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 29; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 29.) Pursuant to the Mack Truck Agreement, each party's share of the defense costs was calculated using a *pro rata* formula based on the periods covered by the Policies or Plaintiff's self-insurance. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 30; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 30.) Defendants assert that, pursuant to the Mack Truck Agreement, the parties' shares of the defense costs for these claims were periodically adjusted, "with Defendants' shares gradually decreasing and [Plaintiff's] share gradually increasing over time." (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 30.) The Mack Truck Agreement has not yet been terminated, and Plaintiff has not placed the Mack Truck Claims at issue in this case (*see* Complaint, dated June 29, 2015 ("Compl.") (Dkt. 1)

10

at 12 n.1; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 30-31), although, to some extent, the parties' arguments on the instant motions nonetheless implicate those claims.[5]

Beginning in late 2000, Plaintiff was also named in a number of asbestos-related bodily injury lawsuits in Michigan. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 34; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 34.) Based on a "handshake" agreement between the parties in or about 2002, defense costs in the Michigan cases were also shared. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 35; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 35; *see also id.* ¶ 31.) Then, over time, the parties entered into informal agreements to share the costs of defending asbestos claims brought in other jurisdictions, as well. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 37, 54; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 37, 54.) Under these informal agreements, Defendants participated in the defense of Underlying Asbestos Claims, although it appears that Defendants did not make any indemnity payments in connection with settlements of claims. (*See* Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 40, 121; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 40, 121.)

From December 2002 to 2011, Timothy Harvey ("Harvey") served as Plaintiff's general counsel, and, together with Donald Miller ("Miller"), who was Plaintiff's local counsel for the Michigan cases, Harvey served as "*de facto*" national coordinating counsel ("NCC") for the Underlying Asbestos Claims. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 26, 42, 59; Pl. Coop./Vol. Paymt. 56.1 Response ¶¶ 26, 42, 59.) On their cross-motions, Defendants characterize the parties' pre-2011 relationship as one of unity and cooperation, by which outside counsel "regularly provided status update reports to the insurers for the cases they were handling" (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 48 (citing Maloney Decl., Ex. 6 (Deposition of Harvey ("Harvey

---

[5] It should also be noted that, according to Plaintiff, "there has been no activity involving the cases that would be subject to the Mack Truck Agreement for many years and such cases have remained dormant." (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 30.)

11

Dep.")), at 184:18-24), Defendants paid only "their proportionate share of defense costs" (*id.*
¶ 55 (citing Maloney Decl., Ex. 22 (Deposition of Jenna Perkins), at 28:19-29:8, 29:20-30:5,
34:12-21; Maloney Decl., Ex. 21 (Deposition of Susan Gunty ("Gunty Dep.")), at 42:8-10)), and
"[l]ocal counsel collaborated both with the insurers and with each other" (*id.* ¶ 58 (citing Harvey
Dep., at 184:18-24; Gunty Dep., at 48:21-49:3)).

Plaintiff, in response, paints Defendants' relationship with local counsel, during the
pre-2011 time frame, as professional, courteous, and responsive, but not as collaborative.
(Pl. Coop./Vol. Paymt. 56.1 Response ¶ 58 (citing Gunty Dep., at 48:17-20).) Although it has
continued to honor the cost-sharing agreement made with respect to the Mack Truck Claims (and
has been willing to carve those claims out from its Complaint in this action (Compl. ¶ 74 n.1)),
Plaintiff nonetheless contends that Defendants are obligated, under the Policies, to pay
100 percent of the defense costs for the Underlying Asbestos Claims, and not just a *pro rata*
share (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 55). Plaintiff also cites instances in which
Defendants seemed to be working against Plaintiff, by, for example, forcing "defense counsel
(Don Miller) to reduce his rates, which forced [Plaintiff] to make up the difference." (*Id.* ¶ 47
(citing Maloney Dec., Ex. 10 (Deposition of Miller ("Miller Dep.")), at 88:16-89:22).) In further
describing the purported conflict of interest between the parties, Plaintiff states that Harvey
warned Plaintiff to "[b]e careful of Candace Buehner [Defendants' representative]," and to "look
very carefully at any proposal she [made]," because, according to Harvey, Travelers "had
mentioned a while back that [they] wanted to decrease Travelers contribution to the [underlying
asbestos] cases." (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 58 (quoting Luttinger Decl., Ex. 36,
at 1).)

### 5.   The Parties' Defense of Underlying
### Asbestos Claims from 2011 to the Present

Up until 2011, it had been the parties' understanding that Harvey's eventual successor as

Plaintiff's general counsel would assume Harvey's role as NCC for the asbestos litigation, with

Miller's continued assistance. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 59 n.9; Pl. Coop./Vol.

Paymt. 56.1 Response ¶ 59.) In January 2011, however, Alan Korman ("Korman") became

Plaintiff's new general counsel (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 65; Pl. Coop./Vol. Paymt.

56.1 Response ¶ 65), and, according to Defendants, Korman "wasted no time" in retaining the

law firm of DLA Piper as NCC for the Underlying Asbestos Claims (Def. Coop./Vol. Paymt.

56.1 Stmt. ¶ 66 (citing Maloney Decl., Ex. 27 (DLA Piper engagement letter))).

While Plaintiff concedes that, prior to becoming Plaintiff's general counsel, Korman had

a relationship with DLA Piper, it takes issue with Defendants' characterization of events, and

states that Korman initially retained the firm "for corporate litigation and intellectual property

matters." (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 66 (citing Maloney Decl., Ex. 8 (Deposition

of Korman ("Korman Dep.")), at 27:11-14, 27:20-28:4).) According to Plaintiff, Korman only

retained DLA Piper as NCC for the Underlying Asbestos Claims following a meeting with local

counsel on those Claims two or three weeks into his tenure, at which time he assessed Plaintiff's

potential liability and determined that he needed to bring in DLA Piper as NCC. (*Id.* (citing

Korman Dep., at 33:10-20).)

In any event, it is undisputed that Korman retained DLA Piper as NCC in February 2011.

(Def. Coop./Vol. Paymt. 56.1 Stmt. ¶ 73; Pl. Coop./Vol. Paymt. 56.1 Response ¶ 73.) It appears,

however, that Korman may not have given Defendants any formal notice of this action, and

certainly did not do so until after the action was taken. (*See* Def. Coop./Vol. Paymt. 56.1 Stmt.

¶ 75 (citing Korman Dep., at 33:21-34:7, 328:18-329:4, as support for Defendants' assertion that

13

Plaintiff "never directly advised Defendants of DLA's retention"); Pl. Coop./Vol. Paymt. 56.1

Response ¶ 75 (quoting Korman Dep., at 34:8-14, as support for Plaintiff's assertion that

Korman "had several conversations in . . . March of [20]11 with Candace . . . of Travelers" about

DLA Piper's retention).) Korman also did not notify Defendants when he replaced some of

Plaintiff's then-existing local counsel with DLA Piper attorneys. (*See, e.g.*, Def. Coop./Vol.

Paymt. 56.1 Stmt. ¶ 83 (citing Maloney Decl., Ex. 35 (Letter to Plaintiff's former local counsel

in Illinois from Plaintiff's Associate General Counsel, dated June 15, 2011).) Plaintiff contends

that Korman did not inform Defendants of these changes because Defendants were not "fully

defending" Plaintiff in the Underlying Asbestos Claims (*i.e.*, paying 100 percent of Plaintiff's

defense costs, instead of a *pro rata* share), because he was dissatisfied with Defendants'

representation of Plaintiff based on his discussions with local counsel, and because he believed

that Defendants' litigation strategy was allowing asbestos liability to go "unchecked" in a way

that would eventually "bankrupt" Plaintiff. (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 69 (citing

Korman Dep., at 327:16-328:17); *see also* Korman Dep., at 117:24-118:5.) Plaintiff claims that

Defendants just wanted local counsel to reduce their fees, even though Plaintiff was facing ever-

growing liabilities in the asbestos arena. (*Id.* ¶ 70 (citing Korman Dep., at 95:8-24).)

Defendants assert that Plaintiff repeatedly postponed meetings with them during this time

period. (Def. Coop./Vol. Paymt. 56.1 Stmt. ¶¶ 106-07 (citing Maloney Decl., Ex. 17 (Deposition

of Craig Paul Olen Johnson), at 65:21-66:9).) Plaintiff, though, contends that it actively wanted

to meet with Defendants to discuss defense strategy, but that Defendants only wanted to talk

about cementing a *pro rata* fee-sharing arrangement for the new crop of cases, and did not want

to meet with DLA Piper. (Pl. Coop./Vol. Paymt. 56.1 Response ¶ 108 (citing Korman Dep., at

52:12-22).)

14

Defendants also state that the attorneys' fees charged to Plaintiff by DLA Piper for its defense of the Underlying Asbestos Claims have been "excessive," in that the rates charged by DLA Piper attorneys have been higher than the "prevailing market rates for attorneys of the same or similar experience level[s], providing comparable services in the same respective geographic communities." (Liberty Mutual Rates 56.1 Stmt. ¶¶ 23, 24; Pierce Decl. ¶ 15; *see also, generally*, Travelers Rates 56.1 Stmt.)

## B. **Procedural History**

Plaintiff filed its Complaint against Travelers and Liberty Mutual on June 29, 2015, asserting claims for breach of contract and breach of the covenant of good faith and fair dealing, and seeking a declaration of its rights under the Policies. (*See* Compl.) The Complaint alleges that Defendants wrongfully refused "to defend and indemnify their insured, [Plaintiff], with respect to thousands of lawsuits commenced in various jurisdictions across America claiming personal injury, including in some cases wrongful death, arising out of alleged exposure to asbestos contained within the products of [Plaintiff] and its predecessor companies." (Compl. ¶ 2.) In addition to seeking damages, costs, interest, and attorneys' fees, Plaintiff seeks a declaration that Defendants are obligated to pay, on behalf of Plaintiff, all past, present, and future defense and indemnity costs associated with the Underlying Asbestos Claims, except for those costs associated with the Mack Truck Claims. (*See* Compl.)[6]

Liberty Mutual filed an Answer to the Complaint on August 28, 2015. (Dkt. 18).) On the same day, Travelers filed a combined Answer, Cross-Claim, Counter-Claim, and Third-Party

---

[6] In a footnote to the Complaint, Plaintiff states: "At this time, [Plaintiff] is specifically not including in this action any matters arising from the Mack Truck Plant in Hagerstown, Maryland, which is the subject of a separate agreement among [Plaintiff], Travelers, and Liberty [Mutual]." (Compl. ¶ 74 n.1.)

15

Complaint against Sentry Insurance Mutual Company ("Sentry") and CMIC. (Dkt. 20.) CMIC

answered Travelers' Third-Party Complaint on October 13, 2015 (Dkt. 36), and Plaintiff

answered the Third-Party Complaint on behalf of Sentry on February 16, 2016 (Dkt. 48).[7]

During the course of these proceedings, but separate from any court filings, the parties

apparently exchanged correspondence that set forth their positions as to the scope of their

responsibilities under the Policies. In the parties' motion and cross-motions, they now

specifically reference one piece of that correspondence – a letter from Defendants to Plaintiff

dated June 12, 2017. (Letter to Alan Korman, from Craig P. Johnson (on behalf of Travelers)

and Jamie Owen (on behalf of Liberty Mutual), dated June 12, 2017 ("Def. 6/12/17 Ltr.")

(Dkt. 116-43).) In addition to reiterating the legal contentions that they make in this case,

Defendants informed Plaintiff in the June 2017 letter that, subject to a number of conditions and

reservation of rights, they would "pay 100% of the reasonable and necessary defense [costs] on a

going forward basis with respect to all active and pending [asbestos] cases outlined in

Attachment A" to the letter (with Attachment A, to this Court's understanding, consisting of a

list of all then-pending Underlying Asbestos Claims on which Plaintiff was named as a defendant

in its individual capacity). (Def. 6/12/17 Ltr., at 2; *see also* Def. Duty To Defend 56.1 Stmt.

¶¶ 73, 75.) Among the conditions stated in the June 2017 letter was the replacement of DLA

Piper with other attorneys, selected by Defendants. (*See* 6/12/17 Ltr., at 2.) Further, with respect

to its reservation of rights, Defendants stated, *inter alia*:

> If the facts of any underlying matter establish that the liability for
> which [Plaintiff] is being sued arises out of a product
> manufactured, sold, distributed and/or handled by an entity that is

---

[7] In its Answer, Sentry, through Plaintiff, stated that it had been fully released by Plaintiff
from all Claims by virtue of a settlement agreement, and that, to the extent it is found to have any
defense or indemnity obligations, the settlement bars any claims against it for contribution. (*Id.*,
at 8.)

16

> not a named insured, Travelers and Liberty [Mutual] reserve the
> right to withdraw from the defense at the close of fact discovery
> and disclaim any obligation to indemnify [Plaintiff].

(*Id.*, at 3.)  Plaintiff did not accept the going-forward defense proffered by Defendants in the

June 2017 letter, but rather chose to proceed with this action in its entirety.

As noted above and discussed further below, currently before this Court are Plaintiff's

motion for partial summary judgment, which it filed on August 18, 2017, and Defendants'

several cross-motions, which they filed on September 22, 2017.

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment

should be granted "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d

123, 128 (2d Cir. 1996).  The moving party bears the burden of showing that no genuine issue of

material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  This burden may be

satisfied "by pointing out the absence of evidence to support the non-movant's claims." *Citizens*

*Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex*, 477 U.S. at 325).

Once the movant meets this burden, the non-moving party "must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*,

477 U.S. at 322-23).  Specifically, the non-moving party must cite to "particular parts of

materials in the record" or show "that the materials cited [by the movant] do not establish the

absence . . . of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1).  The party

17

opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Rather, a party opposing summary judgment "must lay bare [its] proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003) (internal quotation marks and citations omitted); *see Smith v. Menifee*, No. 00cv2521 (DC), 2002 WL 461514, at \*3 (S.D.N.Y. Mar. 25, 2002) (holding that the non-moving party must present "significant probative evidence" tending to support its claims (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968))).

In reviewing the evidentiary record, the court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). If, even viewed in this light, there is not "sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party," or if the "evidence is not significantly probative," then summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). It is well-settled, however, that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citations omitted). The issue for summary judgment is "not whether [the court] thinks the evidence unmistakably

18

favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 788 (2d Cir. 2007) (internal quotation marks and citation omitted).

Under this Court's rules, a party moving for summary judgment under Rule 56 must also submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," Local Civ. R. 56.1(a), and the opposing party must submit a correspondingly numbered statement in response, additionally setting out, if necessary, material facts showing genuine triable issues, *see* Local Civ. R 56.1(b). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record. *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

## II. THE PENDING MOTIONS

As a preliminary matter, this Court notes that the submissions made by the parties in connection with the pending motion and cross-motions are voluminous. Not only did the parties, as noted above, file 17 different Rule 56.1 Statements (either in support of affirmative motions or as counter-statements in opposition), but they also filed 20 separate legal memoranda in support

19

of their positions.[8] Moreover, as can be seen by the lists of the parties' submissions in

footnotes 1-2, *supra*, a number of documents that should have been filed separately share the

same docket numbers; this is because the parties filed certain documents under seal in groups,

rather than individually. In fact, with the exception of Plaintiff's initial moving papers

(Dkts. 114, 115, 116, and 118), the Rule 56.1 Statements filed by Defendants in opposition to

Plaintiff's motion (Dkt. 127, 134), and the Notices of Defendants' cross-motions (Dkts. 128,

130, 132, 135, 136, 139, and 140), *all* of the above-listed papers – including 19 of the parties' 20

legal memoranda, and nearly all of the Declarations/Affidavits, exhibits, and Rule 56.1

Statements placed before the Court – have been filed by the parties under seal. The parties have

---

[8] *See* Memoranda of Law:

    (1)   filed by Plaintiff on Aug. 23, 2017, in support of its motion ("Pl. Mem.") (Dkt. 115);

  (2-8)  filed jointly or separately by Defendants on Sept. 22, 2017, in opposition to Plaintiff's motion and in support of Defendants' various cross-motions ("Def. Duty To Defend Mem." (Dkt. 143); "Def. Allocation Mem." (Dkt. 145); "Travelers Supp. Allocation Mem." (Dkt. 145); "Def. Coop./Vol. Paymt. Mem." (Dkt. 141); "Liberty Mutual Rates Mem." (Dkt. 144); "Travelers Rates Mem." (Dkt. 144); and "Def. Duty To Indemnify Mem." (Dkt. 142));

  (9-13)  filed by Plaintiff on Oct. 20, 2017, in opposition to Defendants' cross-motions and (with respect to the duty to defend) in reply on its motion ("Pl. Duty to Defend Opp./Reply Mem." (Dkt. 148); "Pl. Allocation Opp. Mem." (Dkt. 148); "Pl. Coop./Vol. Paymt. Opp. Mem." (Dkt. 148); "Pl. Rates Opp. Mem. (Dkt. 148); "Pl. Duty To Indemnify Opp. Mem." (Dkt. 148); and

 (14-20)  filed jointly or separately by Defendants on Dec. 1, 2017, in reply on its cross-motions ("Def. Duty To Defend Reply Mem." (Dkt. 158); "Def. Allocation Reply Mem." (Dkt. 155); "Travelers Supp. Allocation Reply Mem." (Dkt. 155); "Def. Coop./Vol. Paymt. Reply Mem." (Dkt. 157); "Liberty Mutual Rates Reply Mem." (Dkt. 156); "Travelers Rates Reply Mem." (Dkt. 156); and "Def. Duty To Indemnify Reply Mem." (Dkt. 149)).

made no attempt to redact these many submissions, and have not sought leave of court to afford them blanket confidentiality protection.

To the extent this Court has relied on any materials filed by the parties under seal, this Court now considers those materials to be "judicial documents," entitled to a presumption of public access. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006); *see also, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358 (SAS), 2013 WL 3531600, at *3 (S.D.N.Y. July 12, 2013 (finding documents submitted in conjunction with a motion to be "judicial documents"). Certainly, to the extent this Court explicitly discusses any such materials, they should be considered integral to its analysis, and thus the presumption of public access to those materials should be accorded significant weight. *See United States v. Amodeo*, 71 F.3d 1044, 1048-49 (2d Cir. 1995) (noting that the weight of the presumption will vary depending on where on the "continuum" the confidential information falls, with the greatest weight given when the information "directly affect[s] an adjudication"). For this reason, and because, on balance, this Court finds that any "competing considerations" to public access (such as the privacy interests of innocent third parties, *see, e.g.*, *Amodeo*, 71 F.3d at 1050-51) are either non-existent or weak, this Court is not placing any part of this Report and Recommendation under seal.

Furthermore, although Judge Marrero previously issued a Protective Order in this case to protect the confidentiality of certain types of discovery material (such as trade secrets and private personal material) *(see* Dkt. 54), the parties' rationale for filing most of their papers under seal, pursuant to that Protective Order, cannot be readily discerned from those papers. Rather, what *is* obvious is that the parties have grossly over-designated their submissions as "Confidential," placing under seal extensive amounts of legal argument and plainly public information.

21

I therefore recommend that all of the papers submitted in connection with the motion and cross-motions be unsealed, absent a focused showing by the parties that portions of those papers contain information that is particularly sensitive, such that the balance of interests weigh in favor of maintaining confidentiality.

## A.  Plaintiff's Motion for Partial Summary Judgment on the Duty To Defend (Dkt. 114), and Defendants' Cross-Motions on the Duty To Defend (Dkt. 132) and on the Appropriate Allocation of Defense Costs (Dkt. 136)

As noted above, this Court will first address Plaintiff's motion for partial summary judgment, in which Plaintiff asserts that the Court should declare that, as a matter of law, Defendants have contractual obligations to provide Plaintiff with a complete defense to all pending Underlying Asbestos Claims (except for the Mack Truck Claims) involving bodily injuries that occurred, in whole or in part, during the Policy Periods, and that this defense obligation will continue with all similar claims that may be asserted in the future. (Dkt. 114.)[9] In conjunction with addressing Plaintiff's motion, this Court will also consider Defendants' cross-motions for partial summary judgment in their favor on the issues of whether the Underlying Asbestos Claims (and future similar claims), by their nature, give rise to a duty to defend at all (Dkt. 132), and, to the extent they do, whether that duty requires Defendants to pay 100 percent of Plaintiff's defense costs, as opposed to a *pro rata* allocated share, based on

_____

[9] In its motion, Plaintiff is only seeking a declaration as to Defendants' obligations to provide a defense; Plaintiff is not seeking, at this time, a ruling requiring Defendants to reimburse it, in any particular sum, for previously incurred defense costs. (*See* Pl. Mem., at 2 n.1 (stating that, "[i]n light of the Insurers' challenge to the reasonableness of the defense costs [Plaintiff] incurred after the Insurers breached their defense obligations, [Plaintiff] is not seeking summary judgment with respect to its breach of contract damages").) As discussed below, however, Defendants' cross-motions are not so narrow. Rather, attacking Plaintiff's claimed contract damages, Defendant is seeking a judicial declaration that DLA Piper's fees, as charged since 2011, have been unreasonable as a matter of law. (*See* Discussion, *infra*, at Section II(B)(2).)

22

Defendants' time on the risk, relative to the time that Plaintiff has been self-insured (Dkt. 136). Essentially, these two particular cross-motions represent the flip-side of Plaintiff's motion: by arguing that, as a matter of law, Defendants are required to provide it with a "complete defense," Plaintiff is teeing up two separate issues for resolution as a matter of law: (1) whether the Claims give rise to a duty to defend (an issue on which Defendants themselves claim to be entitled to judgment, in the first of the cross-motions referenced here), and (2) whether that duty to defend requires Defendants to pay 100 percent of Plaintiff's defense costs (an issue on which Defendants also claim to be entitled to judgment in their favor, in the second of those cross-motions).

For the reasons discussed below, I recommend that each of these motions – Plaintiff's motion seeking a declaration that it is entitled to a complete defense, and Defendants' cross-motions regarding (a) whether the Claims give rise to a duty to defend, and (b) on the issue of allocation – be granted in part and denied in part.

## 1. Applicable Legal Standards Regarding the Duty To Defend

An insurer's "exceedingly broad" duty to defend is triggered "whenever the four corners of the [underlying] complaint suggest – or the insurer has actual knowledge of facts establishing – a reasonable possibility of coverage." *Continental Cas. Co. v. Rapid American Corp.*, 80 N.Y.2d 640, 648 (1993) (internal quotation marks and citations omitted); *accord Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997).[10] It is the insured's burden to establish that the claimed loss falls within the scope of the relevant

---

[10] Based on the substantive law cited by both parties in their summary judgment submissions (*see, e.g.*, Pl. Mem.; Def. Duty To Defend Mem.), the parties have assumed that New York law governs this case, which is "sufficient to establish the applicable choice of law," *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

23

insurance policy, but this burden is met "[i]f the complaint contains any facts or allegations which bring the claim even potentially within the protection purchased." *Mount Vernon Fire Ins. Co. v. Munoz Trucking Corp.*, 213 F. Supp. 3d 594, 601 (S.D.N.Y. 2016) (internal quotation marks and citations omitted), *appeal withdrawn*, No. 16-3699, 2016 WL 10519923 (2d Cir. Nov. 15, 2016).

Further, an insurer is required to pay 100 percent of an insured's defense costs, for both covered and non-covered claims, when the non-covered claims are "intertwined" with covered ones. *Travelers Cas. & Sur. Co. v. Alfa Laval, Inc.*, 37 Misc.3d 1230(A), 2011 WL 9557466 (Sup. Ct., N.Y. County 2011), at *3 ("The obligation to defend is readily understood and its requirement is clear – the insurer must afford a defense to the insured for covered as well as non-covered claims if the latter are intertwined with covered claims."), *aff'd as modified*, 954 N.Y.S.2d 23 (1st Dep't 2012). Where covered and non-covered claims are readily distinguished, however, an insurer need only pay to defend covered claims, and the insured should pay for non-covered ones. *Generali-U.S. Branch v. Caribe Realty Corp.*, No. 25499/91, 1994 WL 903279, at *2 (Sup. Ct., N.Y. County 1994) ("An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay the defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk.").

## 2. **Import of Defendants' June 12, 2017 Letter**

Before proceeding to the substance of the parties' legal arguments regarding Defendants' purported duty to provide a complete defense to the Underlying Asbestos Claims, this Court first notes that, in support of its motion, Plaintiff points to Defendants' June 2017 letter (*see*

24

Background, *supra*, at Section B) as evidence that Defendants have "recently *admitted* that they have a duty to provide 100% of the defense" (Pl. Mem., at 7 (emphasis added); *see also id.*, at 9 (arguing, with reference to Defendants' June 2017 letter, that "there is no genuine dispute that Travelers and Liberty [Mutual] have now finally acknowledged their respective insuring obligations and agreed, albeit belatedly, to 'assume 100% of the reasonable and necessary defense costs in connection with open and pending asbestos cases against [Plaintiff]'")). For their part, and not conceding that they have made any admissions, Defendants contend that Plaintiff's motion on the duty to defend should, in part, be found to be "moot," in light of Defendants' "*offer* to assume" the complete defense of certain of the Underlying Asbestos Claims – specifically, those Claims asserted against Plaintiff in its individual capacity. *(See* Def. Duty To Defend Mem., at 18 n.19 (emphasis added) (internal quotation marks and citations omitted).)

Given the legal contentions asserted in Defendants' June 2017 letter, however, as well as its conditional nature and Defendants' express reservation of certain rights, that letter cannot rationally be construed as an admission, nor can it be read to render any portion of Plaintiff's motion moot. For one thing, it is this Court's understanding that, by their letter, Defendants did not offer to provide a defense for any Underlying Asbestos Claims asserted against Plaintiff solely in its capacity as successor-in-interest to the After-Acquired Entities *(see* Def. Duty To Defend Mem., at 18 n.19), even though Plaintiff plainly seeks a ruling, via its motion, that such claims give rise to a duty to defend *(see* Pl. Duty To Defend Opp./Reply Mem., at 12-13). Moreover, even to the extent Defendants offered in their letter to assume a complete defense of any claims, on a going-forward basis, they expressly reserved the right to discontinue such a defense after the "fact discovery" phase of the litigation – *i.e.*, before expert discovery and any

summary judgment motion practice – if, in their view, it had become apparent that the facts "establish[ed]" that the claimants' injuries arose out of products "manufactured, sold, distributed and/or handled" by any party not named in the Policies as an insured, presumably including the After-Acquired Entities. (Def. 6/12/17 Ltr., at 3.) This hardly represents an unqualified admission that Defendants owed Plaintiff a "complete" defense of any claims, or even an "offer" to provide such a defense.

Accordingly, this Court will proceed to consider the legal arguments made by the parties with respect to the duty to defend, and the scope of that duty.

### 3. The Three "Buckets" of Asbestos Claims at Issue

In its motion, Plaintiff argues that, for all asbestos litigation at issue in this case, Defendants are obligated, under the Policies, to pay 100 percent of Plaintiff's reasonable defense costs, regardless of whether the particular claims in question were or will be (a) asserted against Plaintiff in its individual capacity, (b) asserted against Plaintiff both individually and in its capacity as a successor in interest to one or both of the After-Acquired Entities, or (c) asserted against Plaintiff solely in its capacity as successor in interest, or, for that matter, asserted only against some or all of the After-Acquired Entities themselves, and not naming Plaintiff directly on the claims at all. *(See generally* Pl. Mem.) Defendants, however, reasonably divide the Claims into three "buckets," labeling the first of these categories "Bucket A," the second "Bucket B," and the third "Bucket C," and addressing them separately.

For the reasons that follow, I recommend that the Court grant partial summary judgment in Plaintiff's favor on the issue of whether the so-called Bucket A and B claims give rise to Defendants' duty to defend, but that it grant partial summary judgment in Defendants' favor on the same issue with respect to the Bucket C claims. Further, as to the issue of defense-cost

26

allocation for the Bucket A and B claims, I recommend that – except with respect to the Mack Truck Claims, as to which Plaintiff has agreed to continue to contribute to defense costs – the Court grant Plaintiff partial summary judgment declaring that, at the defense stage of those claims, Plaintiff has no obligation to share in the costs of defense. I also recommend, however, that the Court deny Plaintiff's request for a declaration that the Defendants are jointly and severally liable for the full defense costs of the Bucket A and B claims. Rather, I recommend that (unless the duty to defend is found to be vitiated by any conduct by Plaintiff, as discussed further below), the complete cost of defense of such claims be allocated *pro rata* between Defendants, based on their relative time on the risk.

### a. Bucket A and B Claims

#### i. Whether the Claims Give Rise to a Duty To Defend

Defendants concede that Plaintiff is the named insured on the Policies (Def. Duty To Defend 56.1 Stmt. ¶¶ 8, 13), and it is undisputed that the Policies require Defendants to defend Plaintiff against claims seeking damages for bodily injury that occurred during the Policy Periods (*see* Background, *supra*, at Section A(1)).[11] With respect to Bucket A claims, on which Plaintiff is named as a defendant only in its individual capacity, Defendants' duty to defend should be found to be triggered, if not by the face of the underlying complaints themselves, then by the Insurers' actual knowledge of facts establishing a reasonable possibility of coverage. *See Continental Casualty Ins.*, 80 N.Y.2d at 648. The same should be found for Bucket B claims, as, in the defense stage, the covered claims (as to which Plaintiff may be directly liable) are too

---

[11] Although the parties do not explicitly address the time frame within which the Underlying Asbestos Claims accrued, this Court assumes that it is undisputed that this case only involves claims for bodily injury that allegedly occurred during at least one, if not both, of Defendants' Policy Periods.

27

closely intertwined with the non-covered ones (as to which Plaintiff may only be liable in its capacity as successor in interest to the After-Acquired Entities) to allow for those claims to be readily distinguished. *See Alfa Laval*, 2011 WL 9557466, at \*3; *cf. Generali*, 1994 WL 903279, at \*2.

In arguing that none of the Underlying Asbestos Claims give rise to a duty to defend, Defendants do not contest that the nature of the injuries alleged could give rise to coverage under the Policies. Instead, their arguments boil down to the assumption that, regardless of whether Plaintiff is named in its own capacity on any of the Claims, it cannot be liable on those Claims because any asbestos-containing products that could have caused the claimants' injuries during the Policy Periods were actually manufactured by the After-Acquired Entities (which were not covered by the Policies), rather than by Plaintiff itself. This assumption by Defendants as to who manufactured the products in question is not drawn from the four corners of the existing underlying complaints; instead, Defendants argue that the assumption is warranted because, after "decades of litigation," it has become clear that the injury-causing products were not made by Plaintiff. (Def. Duty To Defend Mem., at 13.)

To the extent Plaintiff has been sued for asbestos-related injuries that could only have been caused by products manufactured by the After-Acquired Entities, the law would support Defendants' assertion that they would have no duty to defend those suits. As correctly noted by Defendants, "'[t]here is no provision in the [Policies] that purports to extend coverage specifically to after-acquired entities for previously incurred liability. An alternative reading would lead to an absurd scenario in which [Defendants] would be obligated to provide coverage to any company acquired by the insured for an indefinite period of time.'" (Def. Duty To Defend Mem. at 15 (quoting *Maryland Cas. Co. v. W.R. Grace & Co. - Conn*, No. 88cv2613

28

(SWK), 1994 WL 592267, at \*4-5 (S.D.N.Y. Oct. 26, 1994)).) Nonetheless, to avoid the duty to defend, Defendants would have to "establish[] as a matter of law that there is *no possible factual or legal basis* on which [they] might eventually be obligated to indemnify [their] insured under any policy provision," *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002) (emphasis added), and this they have not done.

First, Defendants' blanket proposition that, even where Plaintiff has been named in an underlying suit in its individual capacity, it "is only being sued as a result of its acquisition of uninsured entities" (Def. Duty To Defend Mem., at 16) is undercut by Defendants' concession, in footnotes, that the Mack Truck Claims and at least one other Underlying Asbestos Claim did involve Plaintiff's own products (*id.*, at 16 n.16, 17 n.17; *cf. id.*, at 13 (arguing that the products at issue in the Underlying Asbestos Claims were "*virtually* exclusively" manufactured by LTI and Yale (emphasis added))). Defendants' only explanation as to why even the Mack Truck Claims do not give rise to a duty to defend is that Defendants have never, in the past, been required make any indemnification payments. (*Id.*, at 16 n.16.) Defendants argue that, as "no indemnity has ever been paid" in those cases, it should be concluded that there was "no real liability," and hence no duty to defend from the outset. (*Id.*) Yet the fact that Defendants *did not*, in the past, indemnify Plaintiff for any resolved Mack Truck Claims is insufficient to establish that there was no possibility, based on the complaints, that they *might have* been obligated to indemnify Plaintiff on those claims or that they might have such an obligation on similar claims that have not yet been resolved.

Second, and more broadly, this Court is unaware of any authority supporting Defendants' attempt to redefine the well-settled question of when the duty to defend is triggered by reference to an insurer's historical experience with indemnification. Even accepting Defendants'

29

representation regarding how earlier cases have played out, the Shakespearian maxim that "what's past is prologue" has no bearing on the legal question of when a duty to defend arises. Defendants' seeming argument that, because the evidence adduced in past cases against Plaintiff did not lead to an indemnification requirement, all present and to-be-filed asbestos claims against Plaintiff will necessarily end the same way – and that Defendants should therefore not be required to defend Plaintiff against any such claims – would turn the law on its head. An insurer's prediction as to how an evidentiary record in a case will eventually be developed should not deprive an insured of an early defense where an allegation against it could possibly (even if not probably) lead to a finding of liability.

Third, as to Bucket A claims, asserted against Plaintiff in its individual capacity, the Insurers' cannot avoid their duty to defend merely because the claimants' pleaded allegations may not have identified those specific products, made by Plaintiff, that could have caused or contributed to the claimants' injuries. In some instances, while giving notice pleading of the general nature and cause of their injuries, claimant crane operators who were exposed to asbestos may not have identified, in their complaints, any of the particular component parts of the cranes that allegedly contained the asbestos. In others, as in the complaint of claimant Harold Stone (the "*Stone* Complaint") that has been offered by Plaintiff as an exemplar (*see* Pl. Mem., at 5-6), claimants may have identified those crane components to which they were exposed and that that they believed contained asbestos, but they may have made clear that their knowledge was potentially incomplete, such that any pleaded list of components was not intended to be exhaustive. (*See* Schretzman Decl., Ex. 30 (*Stone* Complaint), at 7 (alleging that Stone recalled "being exposed to a number of asbestos products, *including but not limited to* brakes, clutches, hot tops, joint compound, refractory, overhead cranes, overhead crane brakes, and steel furnaces"

30

(emphasis added)[12]).) In both of these scenarios, the claimants' pleadings could be readily construed to include potential claims against Plaintiff for exposure to asbestos in the hoists that it manufactured, and that, according to Plaintiffs, were likely attached to the cranes in question.

Finally, even if the pleadings for certain Bucket A claims appear, on their face, to make allegations only about cranes, those pleadings would still give rise to a duty to defend, as, in light of Plaintiff's representations that the referenced cranes were highly likely to have included hoists that it manufactured (and that contained asbestos), Defendants have "actual knowledge of facts establishing a reasonable possibility of coverage." *Frontier*, 91 N.Y.2d at 175 (internal quotation marks and citation omitted); *Continental Cas. Ins.*, 80 N.Y.2d at 648. Defendants, who have been involved with the defense of Plaintiff's asbestos litigation for years, do not dispute having knowledge that "a crane is a device that supports a hoist and it is used in combination with a hoist to lift a load," that Plaintiff "had an overwhelming market share on hoists," and that "the cranes . . . referenced in asbestos suits contained hoists." (Pl. Duty To Defend 56.1 Response ¶ 35 (quoting Maloney Decl., Ex. 11 ("Kiniry Dep."), at 65:7-21, 68:14-23, 18:2-13, 65:22-66:3, 73:2-24, 92:5-10); *id.* (quoting Maloney Decl., Ex. 2 ("Burkey Dep."), at 13:2-4).) Given these representations by Plaintiff and Defendants' longstanding familiarity with Plaintiff's products and their functions, Defendants "cannot use a third-party's [inartfully drafted] pleadings as a shield to avoid [their] contractual duty to defend [their] insured." *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 63 (1991); *see also id.* at 68 ("[A]n insured's right to a defense should not depend solely on the allegations a third-party chooses to put in the

---

[12] In contending that "the 'four corners' of the *Stone* Complaint fail to 'potentially give rise to a covered claim'" (Def. Duty To Defend Mem. at 21 (quoting *Frontier*, 91 N.Y.2d at 175)), Defendants do not address the fact that the *Stone* Complaint, on its face, indicates that the pleaded list of asbestos-containing products to which the plaintiff was exposed was not intended to be exhaustive (*see id.*).

31

complaint. This is particularly so because the drafter of the pleading may be unaware of the true underlying facts or the nuances that may affect the defendant's coverage, and it might not be in the insured's (or the insurer's) interest to reveal them.").[13]

As there is a reasonable possibility that, in the Bucket A claims against Plaintiff (*i.e.*, the claims that name Plaintiff as a defendant solely in its individual capacity), the referenced cranes utilized asbestos-containing hoists that Plaintiff manufactured, Defendants cannot demonstrate that "there is no *possible* factual or legal basis on which [they] might eventually be obligated to indemnify [Plaintiff]" on those claims. *Burt Rigid Box, Inc.*, 302 F.3d at 97 (emphasis added). As for Bucket B claims, where Plaintiff is named both in its individual capacity and as a successor in interest to the After-Acquired Entities, the Court must determine whether the asserted claims can easily be parsed into potentially covered and non-covered claims, such that Defendants may only be found to be required to provide a defense against the potentially covered claims. In the circumstances presented here, it is evident that the claims cannot be parsed absent the development of case-specific facts regarding the particular source(s) of asbestos that may have caused the claimants' alleged injuries over the duration of their exposure to cranes and attached hoists, and thus the duty to defend must be found to extend to Bucket B, as well as to Bucket A claims.

Accordingly, as a threshold matter, Plaintiff has demonstrated that the Underlying Asbestos Claims on which it is named at least in part in its individual capacity are covered by the

---

[13] The fact that Plaintiff manufactured asbestos-containing hoists that were likely attached to the cranes at issue here distinguishes this case from *Total Waste Mgmt. Corp. v. Commercial Union Ins. Co.*, 857 F. Supp. 140, 142 (D.N.H. 1994), cited by Defendants in opposition to Plaintiff's motion on the duty to defend. In that case, unlike here, there was no question that the insured's liability stemmed exclusively from products made by its after-acquired entity.

Policies, triggering Defendants' duty to defend. *See Mount Vernon Fire Ins. Co.*, 213 F. Supp.

3d at 601 (S.D.N.Y. 2016). I therefore recommend that the portion of Plaintiff's motion that

seeks a declaration that, as a matter of law, the Bucket A and B claims give rise to a duty to

defend by Defendants be granted, and that, to the extent Defendants have cross-moved for partial

judgment in their favor on the same issue, their cross-motion be denied.

### ii.   Whether the Duty To Defend Is Entire

Defendants' combined duty to defend against Bucket A and B claims should also be

found to be entire, meaning that, during the defense stage, no portion of the defense costs should

be allocated to Plaintiff for the periods when it was self-insured by CMIC. On this issue, the

New York Court of Appeals has held that "the duty to defend is broader than the duty to pay,

requiring each insurer to defend if there is an asserted occurrence covered by its policy. . . [T]he

insured should not be denied initial recourse to a carrier merely because another carrier [or the

insured itself] may also be responsible. That is the 'litigation insurance' the insured has

purchased." *Rapid-Am.*, 80 N.Y.2d at 655 (internal citations omitted).

In *Rapid-Am.*, the defendant insured was named in a number of personal injury claims

based on third-party exposure to asbestos-containing products it manufactured. *Id.*, at 646. One

of the plaintiff insurers ("CNA"), in a cross-motion for summary judgment, argued that it had no

duty to defend, and asserted in the alternative that, if it did have a duty to defend, then defense

costs should be allocated *pro rata* among the insurers and the insured itself (which was self-

insured for a period of time), based on all parties' time on the risk. *Id.* at 647. After determining

that the asbestos-related personal injury claims were covered by the relevant insurance policies,

the Court of Appeals affirmed the order of the Appellate Division, which had granted partial

summary judgment to the insured (a) declaring that CNA had a duty to defend in the underlying

33

asbestos suits, and (b) finding that a determination as to whether the insured should share in the defense costs was premature. *Id.*, at 655-56. Notably, the court held that "the allegation that [the insured] was self-insured for a period of time predating the CNA coverage cannot operate to deny [the insured] the complete defense to which it is entitled under the ... policies." *Id.* at 656.

Although the Court of Appeals deferred the question of whether CNA could later seek contribution from the insured for a portion of the defense costs – once it became clear whether and to what extent the underlying injuries occurred outside of the policy periods – it found that the CNA was still required, in the first instance, to fully defend its insured by paying 100 percent of defense costs. *See id.; see also Consol. Edison Co. of New York v. Liberty Mut.*, 193 Misc. 2d 399, 400 (Sup. Ct., N.Y. County 2002) (rejecting insurer's argument that an insured's "self-insurance should be deemed co-insurance with [the insurer's] policy, such that the defense ... costs ... should be split 50/50"); *see also id.* at 401 (noting that "self-insurance does not qualify as insurance at all ... self-insurance is the very antithesis of insurance, because self-insurance means the retention of the risk of loss by the one upon whom it is directly imposed by law or contract, whereas insurance is an agreement by means of which the insured shifts the risk of loss to an insurer" (internal quotation marks and citations omitted)).

In light of the above precedent, this Court concludes that, provided Defendants' duty to defend the Bucket A and B claims is not vitiated by any contract violation on Plaintiff's part (*see* Discussion, *infra*, at Section II(B)(1)), Plaintiff (or CMIC) should not be required, during the defense stage, to contribute to the cost of defense of those claims. Rather, Defendants should be obligated to provide Plaintiff with a complete (*i.e.*, 100 percent) defense of those claims.[14] The

---

[14] Nothing herein is intended to suggest that, at the conclusion of any of the Underlying Asbestos Claims (whether by settlement, judgment, or otherwise), Plaintiff or CMIC would have no obligation to contribute, retroactively, to defense costs, based on the period of self-insurance

34

question remains, however, whether Travelers and Liberty Mutual should each be declared

independently liable for the full defense costs associated with the covered claims, or should only

be held responsible for a portion of the total costs, based on the relative lengths of their time on

the risk.  Whereas Plaintiff argues that Defendants should each be declared separately liable for

the full defense costs wherever their Policies are implicated at all, Plaintiff makes this argument

primarily in the context of arguing that no *pro rata* allocation should be made that includes

Plaintiff or its captive insurer in the allocation.  Plaintiff takes a less emphatic position on the

question of whether Defendants might be required to allocate defense costs as between the two

of them (*see generally* Pl. Allocation Opp. Mem.), and, indeed, such a requirement should make

little economic difference to Plaintiff.

In *Alfa Laval*, the Appellate Division noted that "the pro rata sharing of defense costs

[between insurers] may be ordered when more than one policy is triggered by a claim," *Alfa*

*Laval*, 954 N.Y.S.2d at 452, even though it did not take that step in that case.  In the

circumstances of that case, the Appellate Division found that both of the two insurers in the case

could not "viably provide . . . [a] complete defense if both their policies are implicated by the

same underlying action," *Alfa Laval*, 954 N.Y.S.2d at 452, and thus, rather than allocate defense

costs as between the insurers, the Appellate Division held that Travelers, "as the longstanding

---

relevant to the resolved claims.  *See, e.g., Roman Catholic Diocese of Brooklyn v. Nat'l Union
Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 146 & 153-54 (2013) (affirming that
already-paid $2 million settlement should be allocated on a *pro rata* basis among insurers, with
"the concomitant satisfaction of the [insured's self-insured retention] attendant to each
implicated policy").  Whether Plaintiff should bear a *pro rata* share of defense costs at such time,
however, is not the question currently posed by Plaintiff's motion or Defendants' cross-motions.

insurer, should provide a complete defense," with the other insurer potentially required, "eventually[,] . . . to contribute to both defense costs and indemnification on a pro rata basis," *id.*

Here, in contrast, Defendants have not raised any issue to suggest that the allocation of defense costs between them would not be viable, if Policies issued by both are implicated on the same underlying claims. Indeed, Defendants have a demonstrated history of allocating costs on the Underlying Asbestos Claims (as they shared, for years, in the costs of defense of the Mack Truck Claims and claims in other jurisdictions); they raise no concern about their ability to do so presently or in the future; and they argue strenuously in their submissions that the Policies dictate the appropriateness of *pro rata* allocation. (Def. Allocation Mem., at 9-11 (citing the "occurrence"-based terms of the Policies to support this proposition).) Certainly, at no point does Liberty Mutual (which has the shorter Policy Period in this case) suggest that, in the absence of a judicial ruling requiring CMIC to share defense costs, Travelers should be required to pay Plaintiff's defense costs in full, with Liberty Mutual only potentially contributing later. Further, in offering, in their June 12, 2017 letter, to assume 100 percent of the reasonable cost of defense of all of the Underlying Asbestos claims (subject to certain conditions), Defendants apparently contemplated an ability to allocate 100 percent of those costs between them.

For all of these reasons, and as a matter of equity and efficiency in this particular case, this Court concludes that, as between the two Defendants (but not Plaintiff or CMIC at this juncture), it would be appropriate for defense costs of the Bucket A and B claims to be allocated based on Travelers' and Liberty Mutual's respective time on the risk. Defendants' combined contributions, however, should total 100 percent of the costs of defense of such claims, pending

36

potential later contributions by Plaintiff, unless Defendants are successful in proving that their duty to defend was vitiated by Plaintiff's own conduct.

Accordingly, I recommend that the portion of Plaintiff's motion that seeks a declaration that, as a matter of law, the Bucket A and B claims give rise to a duty to a "complete" defense obligation by Defendants be granted, although I further recommend that Defendants not be held jointly and severally liable for this "complete" defense, but rather that 100 percent of the defense costs of the Bucket A and B claims be allocated between them, based on the relative length of their Policy Periods. I further recommend that Defendants' cross-motion with respect to allocation of defense costs be granted to the extent that a *pro rata* allocation of defense costs as between Defendants should be found appropriate under the Policies, but denied to the extent Defendants are seeking a declaration that Plaintiff's captive insurer, CMIC, should share in defense costs on a *pro rata* basis, as well, prior to the resolution of the underlying claims.

### b.   Bucket C Claims

On the Bucket C claims, Plaintiff is named as a defendant, if at all, only in its capacity as the successor in interest to the After-Acquired Entities. Defendants argue that they have no duty to defend these claims, as the claims do not even potentially fall within the Policies, and as Plaintiff has conceded this to be true. (*See* Def. Duty To Defend Mem., at 14; Def. Duty To Defend Reply Mem., at 3 n.5.)

With regard to Plaintiff's purported concession, Defendants cite a July 19, 2016 email from an attorney representing Plaintiff, and a spreadsheet attached to that email. (Def. Duty To Defend Mem., at 6, 6 n.5 (citing Maloney Decl., Ex. 58 ("Pl. 7/19/16 Email")).) The spreadsheet divides then-existing "active" and "closed" asbestos cases against Plaintiff into different categories, based on how Plaintiff was named in the pleadings, and indicates those categories for

37

which Plaintiff was, at the time of the email, seeking coverage, and those (including claims on which it was named solely as a successor in interest) for which it "concede[d] that the [Policies] do not provide coverage." (Pl. 7/19/16 Email, at 8.) This "concession," however, is not as clear-cut as Defendants suggest, as the email itself seems to focus on "indemnity" payments rather than on the duty to defend. *(See id.,* at 1.) Moreover, much like Defendants' June 2017 letter, Plaintiff's July 2016 email expressly reserves "all [of Plaintiff's] rights and defenses in this matter" *(id.,* at 2), such that it would be inappropriate to view it as an admission. Regardless, though, this Court agrees with Defendants that the Bucket C claims do not give rise to a duty to defend, as those claims, as asserted, cannot be read to fall within the coverage terms of the Policies.

Quoting *Frontier,* 91 N.Y.2d at 175, Plaintiff reiterates the same principle discussed above with respect to Bucket A and B claims: that insurers have a duty to defend any suit "that *potentially* gives rise to a covered claim or where the insurer *has actual knowledge of facts* establishing a reasonable possibility of coverage." (Pl. Duty To Defend Opp./Reply Mem., at 12 (emphasis added by Plaintiff; internal quotation marks omitted).) Plaintiff seeks to extend this principle to Bucket C claims, arguing that, "[h]ere, the Insurers have actual knowledge of facts," *i.e.,* that Plaintiff manufactured hoists that contained asbestos, "establishing a reasonable possibility of coverage for [Underlying Asbestos Claims] that (1) name [Plaintiff] as a successor entity only and (2) that only name the successor entity itself." *(Id.)*

*Frontier,* however, did not turn on an issue of "actual knowledge," but rather on an issue as to whether certain claims against the insured necessarily fell within a policy exclusion. *See generally Frontier,* 91 N.Y.2d 169. The "actual knowledge" language relied upon by Plaintiff derives from the *Fitzpatrick* decision that this Court has cited above, in connection with its

38

analysis of Bucket A and B claims. (*See* Discussion, *supra*, at Section II(A)(3)(a)(i); *see also Frontier*, 91 F.2d at 175 (quoting *Fitzpatrick*, 78 N.Y.2d at 65-67).) In *Fitzpatrick*, the owner of a vehicle was sued after another individual died while operating that vehicle. *Fitzpatrick*, 78 N.Y.2d at 63. The plaintiff in the action (the wife of the deceased) was unaware that the defendant vehicle owner was an officer, shareholder, and director of a company, Cherrywood Landscaping ("Cherrywood"), that the defendant had hired the decedent to complete a landscaping job for Cherrywood, that the defendant had loaned the decedent a vehicle for that purpose, and that the vehicle itself was "used exclusively for [Cherrywood's] landscaping operations." *Id.* at 63-64. Although Cherrywood was not named in the suit, its insurance policy provided coverage for its officers, shareholders, and directors "acting within the scope of [their] duties as such," *id.*, and the insurer was provided with "proof to show that, despite the complaint's inaccuracies, the Fitzpatrick claim actually did involve a covered event," *id.* at 64. The New York Court of Appeals held that the insurer was obligated to defend the claim, finding that invocation of the "four corners of the complaint" rule in that case "and in analogous cases [would] lead[] to an unjust result, since it exalts form over substance and denies an insured party the benefit of the 'litigation insurance' for which it has paid." *Id.* at 70.

It could be argued that Bucket C claims are analogous to the claim asserted in *Fitzpatrick*, as the Bucket C claimants may have simply been unaware that their personal injury claims might lie not only against Plaintiff as the successor in interest to one or both of the After-Acquired Entities, but also against Plaintiff in its individual capacity (as the potential hoist manufacturer). In *Fitzpatrick*, though, "the underlying facts made known to the insurer by its insured unquestionably involved a covered event," *id.* at 69, and the court noted that denying the defendant a defense under the Cherrywood policy "would be to afford the insurer an undeserved

windfall at the expense of its insured," *id.* Here, in contrast, the Bucket C claimants may well have intended to bring suit based only on their exposure to products manufactured by the After-Acquired Entities, and, if that is the case, then their claims are plainly *not* covered by the Policies. Certainly, it cannot be said, as in *Fitzpatrick*, that the Policies "unquestionably" afford coverage for Bucket C claims.

A more relevant precedent for the issue presented here – and, in fact, a decision that addressed the precise question at issue – is *Alfa Laval*. In that case, as here, insurers sought a judicial declaration that they had no duty to defend or indemnify their insured in connection with underlying asbestos litigation. *Alfa Laval*, 2011 WL 9557466, at *1. The insured sought to compel the insurers to "fully defend it" in two underlying actions. *Id.* Travelers, a defendant in that action, argued, as it similarly argues here, that it had no duty to defend or indemnify its insured "with respect to asbestos claims brought against [the insured] in its capacity as a successor" to an entity that was not acquired "until 1988, well after the last Travelers policy lapsed in 1980." *Id.* The court agreed with Travelers on this point, holding that where the insured was named as a defendant in underlying asbestos litigation "solely" because it had acquired a new entity after the last insurance policy lapsed, the insurers had "established as a matter of law that there [was] no possible factual or legal basis on which [they] might eventually be obligated to indemnify [their] insured under any policy provision," and that a narrow grant of summary judgment in the insurers' favor was therefore appropriate. *Id.*, at *3. Where, however, in the underlying litigation, the insured was "charged with direct liability as well as vicarious," the court found that the insurers were obligated to provide the insured "with a complete defense." *Id.*, at *3.

40

Although an insurer should not receive an "undeserved windfall" at an insured's expense in instances where an underlying complaint "accidentally mischaracterize[s] [the insured's] role," *Fitzpatrick*, 78 N.Y.2d at 69, Defendants in this case should not be required to defend Plaintiff in cases in which Plaintiff has not, and may never be, directly named, and where the underlying claimants' decisions as to whom to sue may have been deliberate. Accordingly, I recommend that Plaintiff's motion for partial summary judgment be denied to the extent it seeks a declaration that Defendants are required to defend any Underlying Asbestos Claims in which Plaintiff has not been named in its individual capacity, and that Defendants be granted partial summary judgment in their favor on their cross-motions on this issue. Unless and until Plaintiff is named directly on such claims, Defendants have "established as a matter of law that there is no possible factual or legal basis on which [they] might eventually be obligated to indemnify [their] insured under any policy provision." *Alfa Laval*, 2011 WL 9557466 at *3. Should Plaintiff later be named in its individual capacity on any of the claims, then, at that time, those claims would fall into the "Bucket B" category, and Defendants' duty to defend would be triggered.

**B. Defendants' Cross-Motions on Plaintiff's Alleged Violation of Its Duty To Cooperate and Its Making of Voluntary Payments (Dkt. 128), and on the Issue of DLA Piper's Allegedly Excessive Attorneys' Fees (Dkt. 135)**

In additional cross-motions, Defendants argue that they are entitled to partial summary judgment in their favor on the issues of whether (1) Plaintiff breached their contractual duty of cooperation when, in 2011, Korman allegedly cut off certain communications with them and replaced prior local counsel with DLP Piper (Dkt. 128), (2) Plaintiff, without adequate justification, breached the Policies' voluntary payment provisions (*id.*), and (3) the hourly rates charged by DLA Piper for its services have been unreasonable as a matter of law (Dkt. 135). In response to these cross-motions, Plaintiff argues that, after Defendants breached the Policies by

41

failing to provide a full defense, any subsequent breaches by Plaintiff were excused, as it was forced to defend the Underlying Asbestos Claims in Defendants' stead. Plaintiff also claims that it was fully prepared to work with Defendants, and that it was Defendants who refused to cooperate with Plaintiff regarding defense of the Claims. On these various points, and drawing all reasonable inferences in Plaintiff's favor, this Court finds that genuine issues of material fact exist, rendering summary resolution of Defendants' cross-motions improper.

### 1. Cooperation and Voluntary Payments

#### a. Applicable Legal Standards
#### Regarding an Insured's Policy Obligations

Under New York law, where an insured's cooperation is required under the relevant policy, the deliberate failure of the "'insured to cooperate with the insurer is a breach of a significant condition precedent of the policy which bars the insured's recovery under the policy,'" *Fernandez v. Philadephia Indem. Ins. Co.*, No. 16cv2533 (JCM), 2018 WL 502709, at \*5 (S.D.N.Y. Jan. 19, 2018) (quoting *Allstate Ins. Co. v. Longwell*, 735 F. Supp. 1187, 1193 (S.D.N.Y. 1990)), as well as the insurer's duty to defend, *Lewis v. Nationwide Mut. Ins. Co.*, 202 A.D.2d 816, 817 (3rd Dep't 1994) ("Clearly, . . . the failure to cooperate vitiates the policy and entitles the insurer to disclaim any liability to defend."). In addition, as "unambiguous provisions of an insurance contract must be given their plain and ordinary meaning" under New York law, "consent-to-settle provisions – requiring insured parties to give insurers notice before entering into voluntary settlement agreements – are routinely enforced as a condition precedent to coverage." *SI Venture Holdings, LLC v. Catlin Specialty Ins.*, 118 F. Supp. 3d 548, 550 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Specifically, where an insured violates such a policy provision by failing to obtain the insurer's consent to a settlement, the failure "absolves [the insurer] of any liability for payment under the settlement." *Cont'l Cas.*

42

*Co. v. Ace American Ins. Co.*, No. 07cv958 (PAC), 2009 WL 857594, at \*4 (S.D.N.Y. Mar. 31, 2009).

The insurer bears the burden in seeking to disclaim liability, and that burden has been held to be a "heavy" one. *New York City Hons. Auth. v. Hous. Auth. Risk Retention Grp., Inc.*, 203 F.3d 145, 151 (2d Cir. 2000). In particular, to raise non-cooperation successfully as a defense, the insurer must show: (1) "that it acted diligently in seeking . . . the insured's co-operation"; (2) "that the efforts employed by the insurer were reasonably calculated to obtain the insured's co-operation"; and (3) "that the attitude of the insured, after his co-operation was sought, was one of willful and avowed obstruction." *Country Wide Ins. Co. v. Preferred Trucking Servs. Corp.*, 22 N.Y.3d 571, 576 (2014) (quoting *Thrasher v. United States Liab. Ins. Co.*, 19 N.Y.2d 159, 168 (1967) (internal quotation marks omitted)); *see also W. St. Properties, LLC v. Am. States Ins. Co.*, 150 A.D.3d 792, 795 (2d Dep't 2017) (finding that insurer had "made diligent efforts . . . that were reasonably calculated to bring about the insured's cooperation," where it tried to secure cooperation "through written correspondence, numerous telephone calls, and a visit to the insured's home"), *leave to appeal denied*, 29 N.Y.3d 917 (2017); *Ausch v. St. Paul Fire & Marine Ins. Co.*, 125 A.D.2d 43, 50 (2d Dep't 1987) (finding a breach of cooperation provision where "the record [was] indicative of a pattern of noncooperation and avowed obstruction"). An insured's failure to supply its insurer with information may constitute a breach of its cooperation obligation, but not where the failure is merely "technical" in nature or involves "unimportant omissions or defects"; rather, such a

43

failure must involve information that is "material." *Ausch*, 125 A.D.2d at 50 (internal quotation marks and citation omitted).

Where it is shown that an insurer has breached the duty to defend by repudiating liability for an insured's claims, the insured is excused from performance of its "contractual obligations to cooperate and to obtain [the insurer's] consent to settle." *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 151 A.D.3d 632, 633 (1st Dep't 2017).

## b. Whether Plaintiff Breached Its Obligations, and, If So, Whether the Breach Was Excused

As set out above, both the Travelers and Liberty Mutual Policies require Plaintiff to cooperate with Defendants and proscribe settlement payments made without the Insurers' consent. *(See* Background, *supra*, at Section A(1).) The parties' lengthy course of dealing, though – as to which the parties provide conflicting descriptions – is relevant to the questions of whether, as Plaintiff contends, Defendants essentially forced it to handle its own defense (and to settle claims on its own) by refusing to provide a sufficient defense, or, to the contrary, Plaintiff breached the cooperation and consent-to-settle provisions of the Policies, despite Defendants' good-faith efforts to secure cooperation and to provide Plaintiff with a defense.

Plaintiff cannot ignore the fact that, up until 2011, it *voluntarily* entered into cost-sharing agreements, both formal and informal, with Defendants; that Defendants honored those agreements; and that, under the parties' agreements, Defendants actively provided Plaintiff, for *many years*, with a defense of many of the Underlying Asbestos Claims. With this background, and even with this Court's finding, above, that the Claims at issue legally entitled Plaintiff to a complete defense, Plaintiff is hard-pressed to paint Defendants as abjectly derelict in their duties as insurers, such that Plaintiff could avoid its ongoing duty of cooperation. Moreover, Defendants contend that Korman's arrival in 2011 led Plaintiff to begin "freezing out Defendants

44

from all decisions concerning the strategy, defense and settlement of the Underlying [Asbestos] Claims," by, *inter alia*, appointing DLA Piper as NCC "[w]ithout Defendants' knowledge or consent," unilaterally "fir[ing] and replac[ing] local counsel in several jurisdictions," and instructing DLA Piper to coordinate with Defendants only "on rare occasions when [Korman] was in a good mood." (Def. Coop./Vol. Paymt. Mem., at 21-22 (internal quotation marks and citation omitted).) Defendants further contend that they made "diligent efforts to obtain [Plaintiff's] cooperation through repeated written correspondence and telephone calls" and attempts to schedule meetings, in the face of Korman's, and by extension Plaintiff's, "brazen[] . . . obstructionism." (*Id.*, at 22-23.)

As articulated by Plaintiff, however, the relevant facts are quite different. Plaintiff cites the deposition testimony of Korman and others to assert that, when Korman stepped into Harvey's shoes as Plaintiff's new general counsel, he faced an increasing number of asbestos litigation filings spreading into new jurisdictions. (Pl. Coop./Vol. Paymt. Opp. Mem. at 2; Korman Dep., 106:24-107:13; Miller Dep., 42:13-43:5.) He also questioned why Defendants were paying only a *pro rata* share of Plaintiff's defense costs in the Underlying Asbestos Claims, instead of "paying 100% of the defense, which he understood was their duty." (*Id.*, at 3.) In this iteration of events, Korman "engaged in multiple discussions with Travelers . . . about the risk facing [Plaintiff] and the rationale for the current strategy," but the Defendants "did not want to meet with [] Korman and DLA [Piper] to discuss the new strategy." (*Id.*, at 4.) According to Plaintiff, the only thing Defendants wanted to discuss was whether Plaintiff would agree to extend the cost-sharing structure used in Mack Truck Agreement to new third-party asbestos suits. (*Id.*, at 5.) Plaintiff argues that Defendants not only refused to defend Plaintiff fully, but were actively working against Plaintiff's interests. (*Id.*, at 4-5.)

While, if Defendants' accounts were credited, this might be sufficient to show the type of

"willful and avowed obstruction" necessary to meet their heavy burden to disclaim further

defense and indemnity obligations, it is not for the Court to credit Defendants' version of the

facts in evaluating their cross-motions. Instead, where Defendants are the moving parties, this

Court "must view the evidence in the light most favorable to [the Plaintiff] . . . and must draw all

reasonable inferences in [Plaintiff's] favor." *L.B. Foster Co.*, 138 F.3d at 87. Moreover,

"[a]ssessments of credibility and choices between conflicting versions of the events are matters

for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011

(2d Cir. 1996). As the parties' recitation of the relevant facts are almost diametrically opposed,

this Court finds that triable issues of material fact preclude summary judgment in Defendants'

favor with respect to the issue of cooperation. Similarly, the differing versions regarding the

breakdown of the parties' relationship also preclude a finding that Plaintiffs were entitled to

proceed to settle claims without Defendants' consent. If Defendants' evidence were credited,

Defendants stood ready and willing, at all relevant times, to work with Plaintiff on providing an

ongoing defense of the Underlying Asbestos Claims, whereas, if Plaintiff's evidence were

credited, it had little choice but to go it alone after Defendants refused even to meet with Plaintiff

to discuss the path forward.

I therefore recommend that Defendants' cross-motion for partial summary judgment as to

Plaintiff's alleged violations of the cooperation and voluntary payment provisions of the Policies

be denied.

## 2.    Reasonableness of Defense Counsel's Billing Rates

In a cross-motion filed by Liberty Mutual and a coordinated cross-motion filed by

Travelers, Defendants request that the Court find the rates charged by DLA Piper in connection

with its defense of the Underlying Asbestos Claims to be unreasonable as a matter of law. (*See generally* Liberty Mutual Rates Mem.; Travelers Rates Mem.)  Defendants also request a partial summary judgment ruling that, to the extent Defendants may be found obligated to reimburse Plaintiff for any defense costs, their payment obligations should be limited to the purportedly "prevailing reasonable hourly rates" set out in the report of Liberty Mutual's expert on fees, John S. Pierce ("Pierce"). (Liberty Mutual Rates Mem., at 13; *see also* Pierce Decl.; *see generally* Travelers Rates Mem.)  Liberty Mutual describes Pierce as having spent "28 years serving as an expert in the evaluation of attorneys' fees and costs" (Liberty Mutual Rates Mem., at 7; Pierce Decl. ¶ 2), and, although Travelers has submitted the separate opinion of its own expert, Gerry Tostanoski ("Tostanoski") (whom Travelers describes as an attorney with "over 30 years of experience in representing defendants in asbestos litigation" (Travelers Rates Mem., at 1-2; *see* Minetto Decl., Ex. 27 (Expert Report of Gerry H. Tostanoski, dated Apr. 7, 2017 ("Tostanoski Report"))), Travelers states that the two experts' reports are generally consistent, and urges the Court to adopt Pierce's assessment of "reasonable rates" (Travelers Rates Mem., at 1 (joining in "the relief requested by Liberty Mutual")).  Plaintiff challenges both of Defendants' proffered expert reports, and argues that Defendants have not met their burden of demonstrating the unreasonableness of the fees in question. (*See generally* Pl. Rates Opp. Mem.) Having reviewed the parties' submissions, this Court finds that disputed factual issues preclude summary judgment in Defendants' favor on this point.

### a. Applicable Legal Standards Relating to the Reasonableness of Attorneys' Fees in this Context

"Where . . . an insured is forced to defend an action because the insurer wrongfully refused to provide a defense, the insured is entitled to recover its reasonable defense costs, including attorneys' fees." *Danaher Corp. v. Travelers Indem. Co.*, No. 10cv0121 (JPO) (JCF),

47

2015 WL 409525, at *2 (S.D.N.Y. Jan. 16, 2015), *report and recommendation adopted*, 2015

WL 1647435 (Apr. 14, 2015) (citations omitted). Further, "[w]here an insurer has breached its

duty to defend, the insured's fees are presumed to be reasonable and the burden shifts to the

insurer to establish that the fees are unreasonable." *Olin Corp. v. Ins. Co. of N. Am.*, 218 F.

Supp. 3d 212, 228 (S.D.N.Y. 2016) (citing *Danaher Corp.*, 2015 WL 409525, at *7 (S.D.N.Y.

Jan. 16, 2015)); *see also Danaher*, 2015 WL 409525, at *7 (rejecting Travelers' non-specific

objection to insured's litigation expenses, where "Travelers ha[d] the burden to show that

claimed defense costs [were] unreasonable or unnecessary since it breached its duty to

defend").[15]

### b.   Whether Defendants Have Demonstrated
### DLA Piper's Fees To Be Unreasonable

As Defendants rely entirely on their experts' analyses regarding the alleged

unreasonableness of DLA Piper's fees (*see generally* Liberty Mutual Rates Mem.; Travelers

Rates Mem.), their cross-motions for partial summary judgment on this issue must rise or fall

---

[15] This court notes that Defendants have misstated the law with respect to who has the
burden of proof on the issue of the reasonableness of DLA Piper's fees. In their cross-motions,
Defendants state that Plaintiff has the "burden of establishing the reasonableness of the hourly
rates requested." (Liberty Mutual Rates Mem., at 11; *see also* Travelers Rates Reply Mem., at 3
(arguing that "[i]t is [Plaintiff's] burden to demonstrate the reasonableness of DLA[] [Piper's]
rates and it has completely failed to do so").) The cases on which Defendants rely, however, do
not arise in the insurance context presented here. Rather, Defendants cites cases in which courts
have evaluated the reasonableness of attorneys' fees in the more common context of fee
applications made by prevailing parties at the close of litigation. *See, e.g., Reiter v. MTA of the
State of N.Y.*, No. 01cv2762 (GWG), 2004 WL 2072369, at *4 (S.D.N.Y. Sept. 10, 2004) (stating
that, in seeking fees as a prevailing party in a Title VII action, "the fee applicant bears the burden
of establishing the reasonableness of the hourly rates requested") (cited in Liberty Mutual Rates
Mem., at 11 and in Travelers Rates Reply Mem., at 3). In this case, though, as set out above and
in Plaintiff's opposition brief (*see* Pl. Rates Opp. Mem., at 6), if Defendants are required to
reimburse Plaintiff for defense costs because of Defendants' breach of the duty to defend, then
the fees incurred by Plaintiff must be presumed reasonable, and the burden to demonstrate
"unreasonableness" will lie with Defendants.

48

with those analyses. Having considered both expert reports, as submitted, this Court finds flaws with both that preclude summary judgment in Defendants' favor.

First, this Court finds that the analytical approach taken by Liberty Mutual's expert, Pierce, would inappropriately depress the limits of what may be considered "reasonable" billing rates for particular attorneys, in particular litigation. In a footnote to the chart that he prepared to set out his work, Pierce states that, under Supreme Court precedent, "a reasonably hourly rate is generally equated to the *prevailing market rate for attorneys providing comparable services.*"
(Pierce Decl., Ex. A-2, at 1 n.2 (emphasis in original).)[16] Pierce then states:

> [T]he prevailing rate is neither the highest rate chargeable not [sic] the lowest. Instead, as the term suggests, it is the one most *'prevalent'* or the most *'frequent'* or the most *'customarily charged.'* I thus look primarily at the *median* hourly rate in hourly rate surveys as the best indication of the prevailing market rate.

(*Id.* (emphases in original).) The most "frequently" charged rate, however, would not be the "median" (*i.e.*, the mid-point of values), but rather the "mode," and would be calculated differently from the median. Either way, though, Pierce's comments fail to appreciate that there are ranges of attorney rates that may be reasonably charged in a given case. *See Carter v. City of Yonkers*, 345 Fed. Appx. 605, 608 (Summary Order) (noting with approval that, in determining counsel's reasonable rate, district court "considered the *range* of approved rates for attorneys doing comparable work" in the district (emphasis added)); *Danaher*, 2015 WL 409525, at \*9 (noting that attorney rates "must merely fall within a *range* of reasonableness" (emphasis

---

[16] Although Pierce purports to rely on *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.4 (1983), for this proposition (*see* Pierce Decl., Ex. A-2, at 1 n.2 (misspelling case name as "*Hensley v. Eckhart*")), *Hensley* does not actually stand for the proposition for which Pierce would cite it, *see Hensley*, 461 U.S. at 433 (holding that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," but not defining a reasonable hourly rate).

added)); *see also Gortat v. Capala Bros., Inc.*, 621 Fed. Appx. 19, 22 (2d Cir. 2015) (Summary Order) ("In setting the reasonable hourly rate, courts should 'bear in mind . . . case-specific variables'" (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008)). By taking the position that reasonable rates are best measured by the median (or the mode) of the rates charged by similarly experienced counsel in relevant markets, Pierce excludes from his analysis any higher rates that might be less commonly charged, but might still be "reasonable" in the circumstances presented.

Further, assuming that Pierce actually, as he claims, derived "median" rates from certain rates surveys, this Court cannot discern how he then went on to deduce what the reasonable rate should be, for a given attorney, from the various median rates he compiled. For example, in setting the rate that he considered reasonable for the work performed in 2011 by Adam A. DeSipio ("DeSipio"), a senior associate at DLA Piper (and the first attorney identified in Pierce's chart), Pierce lists four supposed "median" associate rates from various rate surveys ($240, $274, $240, and $370 per hour), but he then fails to acknowledge that the rate charged by DLA Piper for DeSipio's work in 2011 was $285 per hour, a rate that closely approximates the average of the median rates that Pierce supposedly thought were most relevant. Rather than rely "primarily" on those median rates, Pierce concludes – with no further explanation – that the "reasonable" rate for DeSipio in 2011 was $215 per hour, a rate lower than any of the medians he claims to have used as reference points. (Pierce Decl., Ex. A-2, at 1-2.)

In deriving DeSipio's "reasonable rate," Pierce apparently also relied on two additional rates that were not derived from surveys, but rather had been paid by Liberty Mutual itself, for the work performed in asbestos litigation by senior associates at two unnamed law firms. (*Id.* ¶ 26(4).) At $170 and $165 per hour (*id.*, Ex. A-2, at 2.)), these rates are notably lower than

50

the market median rates that, according to Pierce, should be considered by the Court to be the most persuasive indicators of reasonableness. In a similar vein, in opining as to a reasonable range of attorney rates for asbestos litigation, Travelers' expert, Tostanoski has relied – in her case, entirely – on the range of "blended" rates that Travelers has typically paid to its approved counsel in such litigation. (Tostanoski Report, at 3-6; *see also* Travelers Rates Mem., at 2.) To the extent either of Defendants' experts has sought to compare DLA Piper's rates to the rates customarily paid by *insurers* for coverage counsel, the comparison is not apt, as insurance companies, due to the volume of work they offer, may well be able to negotiate for lower attorney billing rates than could be obtained by other types of clients in the marketplace. (*See* Pl. Rates Opp. Mem., at 13-14.) Thus, the attorney rates that are customarily paid by insurers may fall at the lower end of a reasonable range for like services (as, in fact, can be seen by the rates listed by Pierce in his chart), and should not be used as a standard by which the upper limit of that range is measured.

Moreover, returning to Pierce's analysis, even if the lower, insurance-paid rates that he identified in his chart were added to the mix, this Court still cannot determine how he concluded, for example, that the "reasonable" rate for DiSipio's work, in 2011, should be found to be no more than $215 per hour. This rate represents neither the median, nor the mode, nor, for that matter, the average of the listed rates that Pierce supposedly considered, and this Court has been unable to replicate any math that Pierce may have used to calculate the value at which he asserts DiSipio's rate for 2011 should be capped. In its opposition brief, Plaintiff quotes Pierce as having testified at his deposition, "I don't do a mathematical computation." (Pl. Rates Opp. Mem., at 18 (quoting Minetto Decl., Ex. 24 (Deposition of Pierce), at 118:17-18).) Indeed, a close review of his Declaration reveals no formula, no logic, and no stated justification for

Pierce's selection of $215 as the upper limit of a reasonable rate for DiSipio, as Pierce merely states, "[a]fter reviewing and comparing DLA [Piper] NCC rates to th[e] survey billing rates, I set a reasonable billing rate for each timekeeper which was in my opinion a reasonable prevailing rate." (Pierce Decl. ¶ 27.)

Even apart from the seeming arbitrariness of Pierce's conclusions, it seems evident that he failed to look at relevant case-specific variables. A reasonable fee has been described in this Circuit as "what a reasonable, paying client would be willing to pay," *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 184 (2d Cir. 2008), and a number of factors should be considered in making that determination. Factors that may be important to an overall lodestar analysis of reasonable fees include, for example, the qualifications and special expertise of the attorneys, the complexity of the work they were called upon to perform, and the nature of their track record and the degree of their success in the litigation in question. *See, e.g., id.* ("the district court should, in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, [and] the available expertise and capacity of the client's other counsel . . ."); *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) ("[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained."). In a lodestar analysis, at least the level of a particular attorney's expertise and the "quality of [his or her] performance" should be considered in determining the reasonable hourly rate. *Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010) (internal quotation marks and citations omitted).

While Pierce notes, in his chart, the number of years that each of the DLA Piper attorneys on the team had been in practice (*see* Pierce Decl., Ex. A-2), he does not discuss (for example) the fact that, by 2011, DiSipio already had 18 years of experience (*id.*, Ex. A-2 at 1) – more than

52

some partners – or consider whether the specific work DiSipio performed for Plaintiff was at a

partner level. On a similar note, Plaintiff strongly takes issue with the opinion expressed by

Pierce that the lead attorney on the DLA Piper team, William F. Kiniry, Jr. ("Kiniry"), who

charged Plaintiff at hourly rates ranging from $765 to $900 over the period from 2011 to 2016,

should have reasonably charged no more than $290 to $335 – only about $100 per hour more

than the rates that Pierce claims would have been reasonable for the associates working on the

case. (*See* Liberty Mutual Rates Mem. (Addendum); Pl. Rates Opp. Mem., at 12.) Plaintiff

describes Kiniry as not just being a senior partner at a national firm, but as one who came with

"three decades of experience successfully developing and implementing complex national

product liability defense strategies." (Pl. Rates Opp. Mem., at 5.) In fact, Plaintiff asserts that

Kiniry has played this type of critical leadership role in handing "national asbestos defense for

numerous entities, including Kawasaki, Harley Davidson, Porsche, BASF, Northup Grumman,

Ford, and Caterpillar." (*Id.*, at 12.) Plaintiff asserts that other, similarly situated clients have

"paid similar or higher rates" for Kiniry's time (*see id.*, at 5), and that Plaintiff actually

negotiated discounted rates for his services (*see id.*, at 4, 7-8), facts that Pierce did not consider.

Finally, because context matters when determining the reasonableness of attorneys' fees,

this Court notes that where the work to be performed is particularly difficult, this may justify the

client's hiring of especially skilled counsel – and thus paying higher counsel rates – than might

be customary in the market for less difficult work. Defendants do not seriously challenge

Plaintiff's representation that, at the time it retained DLA Piper, Plaintiff's asbestos cases were

"doubling," in an expanding number of jurisdictions (*id.*, at 10), and that it was in Plaintiff's

interest to have a highly experienced attorney take the reins as NCC. Plaintiff also suggests, in

its papers, that the asbestos litigation was not just expanding, but was, at that time, in such

disarray that exceptional attorney skill was needed to rein in costs and get matters under control. According to Plaintiff, when Korman came on board as Plaintiff's new general counsel, he "apprised the situation as dire" (Pl. Rates Opp. Mem., at 2), finding "no centralized coordination" among the asbestos cases pending in different jurisdictions, "no leadership," and "no defense strategy in place" (*id.*, at 9 (quoting Korman Dep., at 23:20-24)).  While Defendants generally urge the Court to discredit Korman's testimony as "self-serving and uncorroborated" (Def. Coop./Vol Paymt. Reply Mem., at 1), the role of the Court, as noted above, is not to take credibility determinations away from the jury.  At the very least, Plaintiff's assertions regarding the supposed "sorry state" of Plaintiff's overall defense to the Underlying Asbestos Claims (Pl. Rates Opp. Mem., at 10) raise material factual issues as to why it chose DLA Piper to take over the role of NCC, and, hence, whether it may have been reasonable for Plaintiff to pay the rates charged by that firm, even if higher than the rates that may have been charged by firms with lesser resources and less of a national profile.

In sum, this Court concludes that Defendants have not, by way of their cross-motions, overcome the presumption that DLA Piper has charged Plaintiff reasonable rates.  Certainly, in light of the factual issues raised by Plaintiff regarding the context of DLA Piper's retention and the level of its experience in a national coordinating role, and viewing the evidence in the light most favorable to Plaintiff, this Court cannot find that Defendants have met their burden to demonstrate that, as a matter of law, DLA Piper's rates have been unreasonably high and should be capped at those set out in the Pierce opinion.  Accordingly, I recommend that Defendants' cross-motions on the reasonableness of defense costs be denied.  *See Olin*, 218 F. Supp. 3d at

228 (denying summary judgment on the issue of the reasonableness of defense costs where the record presented disputes of material fact).

C.      **Defendants' Cross-Motion on the Duty To Indemnify (Dkt. 130)**

Defendants' final cross-motion for partial summary judgment seeks a judicial finding that Defendants have no duty to indemnify Plaintiff with respect to any of the Underlying Asbestos Claims. (*See generally* Def. Duty To Indemnify Mem.)  In support of this cross-motion, Defendants' argue, as they do in support of their cross-motion on the duty to defend, that all of the products that are actually at issue in those Claims were manufactured by Plaintiff's After-Acquired Entities.  Thus, Defendants' contend, they can have no obligation to provide coverage for any claimants' injuries. (*See id.*, at 9-12.)  This cross-motion should be denied as to "Bucket A and B" claims, with little ado, but granted as to "Bucket C" claims (unless the underlying pleadings are amended to add claims against Plaintiff in its individual capacity).

Where an insurance "policy includes an obligation to defend, [but] . . . there is a doubt as to whether the claim comes within the insurer's duty to indemnify, the insurer is generally required to furnish a defense, leaving the issue of indemnification to be settled after establishment of the insured's liability." *Cowan v. Codelia, P.C.*, No. 98cv5548 (JGK), 1999 WL 1029729, at *4 (S.D.N.Y. Nov. 10, 1999) (internal quotation marks and citations omitted)).  A motion for summary judgment regarding the Defendants' indemnification obligation "is premature where . . . 'the complaint in the underlying action[s] allege[] several grounds of liability, some of which invoke the coverage of the policy, and where the issues of indemnification and coverage hinge on facts which will necessarily be decided in [those] underlying action[s]." *Scottsdale Ins. Co. v. United Indus. & Const. Corp.*, 137 F. Supp. 3d

167, 179 (E.D.N.Y. 2015) (quoting *Specialty Nat'l Ins. Co. v. English Bros. Funeral Home*, 606 F. Supp. 2d 466, 472 (S.D.N.Y. 2009)).

In line with what this Court has discussed above, a past history of claims that did not ultimately lead to indemnification does not eliminate the possibility that a past, present, or future claim will yield a different result. Further, as already explained with respect to Bucket A and B claims, even where Plaintiff's products are not explicitly named in the underlying pleadings, there is a reasonable possibility that coverage under the Policies could be implicated on those claims, as Plaintiff has shown a likelihood that its asbestos-containing hoists were attached to the cranes at issue. *(See* Discussion, *supra*, at Section II(A)(3)(a)(i).) For these reasons, Defendants have not established – and cannot establish, at this time – that they will not be obligated to indemnify Plaintiff on any of the Underlying Asbestos Claims on which Plaintiff is named in its individual capacity, once those claims reach final resolution.

At bottom, as long as there is a reasonable possibility that the Underlying Asbestos Claims may be covered under the Policies (which this Court finds to be the case with any such claims asserted against Plaintiff in its individual capacity), then Defendants have a duty to defend Plaintiff on those claims, and cannot show, as a matter of law, that the claims will not implicate their duty to indemnify. I therefore recommend that Defendants' motion for partial summary judgment as to the duty to indemnify be denied as premature, with respect to such claims. For substantially the same reasons discussed above, however, I recommend that the cross-motion be granted with respect to claims on which Plaintiff is named only in a successor-in-interest capacity.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the pending motions and cross motions be resolved as set out below:

(1) Plaintiff's motion for partial summary judgment (Dkt. 114) should be granted in part and denied in part, as follows:

    (a) As to the issue of whether the Underlying Asbestos Claims give rise to a duty by Defendants to defend, the motion should be granted to the extent that Plaintiff seeks a ruling that the claims on which it is named as a defendant in its individual capacity give rise to such a duty, and otherwise denied; and

    (b) As to the issue of whether the claims on which Plaintiff is named in an individual capacity give rise to a duty to provide a complete defense on a going-forward basis, the motion should be granted to the extent that the Court should find that no portion of the defense costs of those claims should be allocated to Plaintiff or its captive insurer during the defense phase of the underlying cases, but denied to the extent Plaintiff seeks to hold each defendant jointly and severally liable for the full defense of the claims; rather the Court should hold that the cost of the complete defense of those claims should be allocated *pro rata* between Defendants, until such time as the claims are settled or otherwise resolved, at which time Defendants may seek to require Plaintiff to contribute to the cost of defense. This aspect of the Court's ruling, however, should not extend to the Mac Truck Claims, which Plaintiff has carved out from the relief it seeks in this case.

(2) Defendants' cross-motions for partial summary judgment should be resolved as follows:

    (a) The cross-motion on the issue of whether the Underlying Asbestos Claims give rise to the duty to defend (Dkt. 132) should be granted to the extent that Defendants seek a ruling that no such duty arises as to the claims on which Plaintiff is named as a defendant solely in its capacity as a successor in interest to one or both of the After-Acquired Entities or is not named at all, and otherwise denied;

    (b) The cross-motion on the allocation of defense costs (Dkt. 136) should be granted in part and denied in part, consistent with the Court's resolution of this portion of Plaintiff's motion;

    (c) The cross-motion on Plaintiff's alleged breach of the cooperation and voluntary payment provisions of the Policies (Dkt. 128) should be denied;

(d)     The cross-motion on the reasonableness of DLA Piper's rates (Dkt. 135) should be denied; and

(e)     The cross-motion on the duty to indemnify (Dkt. 130) should be granted to the extent that Defendants seek a ruling that no such duty arises as to the claims in which Plaintiff is named as a defendant solely in its capacity as a successor in interest to one or both of the After-Acquired Entities or is not named at all, and otherwise denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections. Such objections, and any responses to objections, shall be filed with the Clerk of

Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero, United

States Courthouse, 500 Pearl Street, Room 1040, New York, 10007, and to the chambers of the

undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York

10007. Any requests for an extension of time for filing objections must be directed to

Judge Marrero. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL

RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.

*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38

(2d Cir. 1983).

Dated:  New York, New York
        August 10, 2018

                              Respectfully submitted,

                              DEBRA FREEMAN
                              United States Magistrate Judge

58

Copies to:

The Hon. Victor Marero, U.S.D.J.

All parties (via ECF)